**Kimberly Michele ALEXANDER,
Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 04–06–00082–CR.

Court of Appeals of Texas,
San Antonio.

May 2, 2007.

734

Cornelius N. Cox, Law Office of Cornelius N. Cox, San Antonio, for appellant.

Daniel Thornberry, Asst. Crim. Dist. Atty., San Antonio, for appellee.

Sitting: ALMA L. LÓPEZ, Chief Justice, PHYLIS J. SPEEDLIN, Justice, REBECCA SIMMONS, Justice.

## MEMORANDUM OPINION

Opinion by PHYLIS J. SPEEDLIN, Justice.

Kimberly Michele Alexander appeals her conviction for the capital murder of her daughter Diamond Alexander–Wash-ington. We affirm the trial court's judgment.

BACKGROUND

When Diamond Alexander was born, she was placed into the custody of Child Protective Services (CPS), and later with a foster family, where she remained until she was two years old. On March 31, 2004, Diamond was placed back with her biological mother, Kimberly Alexander. On June 5, 2004, at approximately 4:00 p.m., police and EMS received a call that a child was in cardiac arrest. When EMS arrived at the apartment, they found two-year old Diamond lying on the living room floor, unresponsive. Diamond had no pulse or respiration, and her EKG was a "flat line." Her mother, Kimberly Alexander, was present along with a friend, Elizabeth Youngblood, who was also living in the apartment. When questioned at the scene about Diamond's medical history and what happened to her, Alexander made no response and her demeanor was detached and unemotional; Alexander later told police that Diamond had fallen off her training potty. Diamond was airlifted to a hospital where she was diagnosed as being in complete cardiopulmonary arrest; she was removed from life support and pronounced dead the next day. Diamond's body exhibited extensive bruising on her forehead, chest, back, both arms and both legs, along with hemorrhaging around her optic nerves, and a closed head injury, with swelling and bleeding in the brain. Her liver also had a significant laceration, which was a potentially fatal injury. The medical examiner who performed the autopsy concluded that all the injuries were the result of blunt force trauma occurring within the same time period, and that at least three different instruments were used to inflict a minimum of 26 blows. Diamond's cause of death was determined

to be blunt trauma to the head and thorax. Alexander was indicted for capital murder. After a jury trial, Alexander was convicted of capital murder, and sentenced to life in prison. This appeal followed.

## ANALYSIS

### *Sufficiency of the Evidence*

 In her first issue, Alexander argues the evidence is legally and factually [1] insufficient to support the jury's finding that she intentionally or knowingly caused Diamond's death; she asserts she merely intended to discipline her child, and there is nothing in the record to suggest she intended to cause her death. In determining legal sufficiency, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex.Crim.App.2005). The jury, as trier of fact, is the sole judge of the credibility of the witnesses and the weight to be given their testimony; therefore, reconciliation of any conflicts in the evidence is within the exclusive province of the jury. *Mosley v. State*, 983 S.W.2d 249, 254 (Tex.Crim.App.1998). The jury is also permitted to make reasonable inferences from the evidence. *Id.* at 254–55.

 In determining factual sufficiency, we view all the evidence in a neutral light, both for and against the jury's verdict, and only set aside the verdict if "proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof." *Vodochodsky*, 158 S.W.3d at 510; *Watson v. State*, 204 S.W.3d 404, 414–15 (Tex.Crim.App. 2006); *Cain v. State*, 958 S.W.2d 404, 407 (Tex.Crim.App.1997) (court views "all the evidence without the prism of 'in the light most favorable to the prosecution' and sets aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust"). The factual sufficiency analysis consists of two prongs: (1) "whether the evidence introduced to support the verdict, though legally sufficient, is nevertheless 'so weak' that the jury's verdict seems 'clearly wrong and manifestly unjust;' " and (2) "whether, considering conflicting evidence, the jury's verdict, though legally sufficient, is nevertheless against the great weight and preponderance of the evidence." *Watson*, 204 S.W.3d at 414–15. The appellate court is authorized to disagree with the jury's determination, even if probative evidence exists which supports the verdict, but must avoid substituting its judgment for that of the fact-finder. *Id.* at 415, 417; *Johnson v. State*, 23 S.W.3d 1, 9 (Tex.Crim.App. 2000) (factual sufficiency review requires appellate court to afford "due deference" to jury's determinations).

The indictment charged Alexander with capital murder by alleging she "intentionally and knowingly caus[ed] the death of Diamond . . . by striking [her] with a plastic tube, by striking [her] with the hand of the defendant, by striking [her] with an object or objects unknown to the grand jury, and by striking [her] against an object or objects unknown to the grand jury, and Diamond . . . was a child under six years of age." *See* TEX. PENAL CODE ANN. §§ 19.03(a)(8), 19.02(b)(1) (Vernon Supp.

---

1. Alexander's brief refers to factual sufficiency of the evidence, as well as legal sufficiency, but cites no authority and provides no argument in support of a factual sufficiency challenge; however, in the interest of completeness, we will perform a factual sufficiency analysis of the evidence. *See* TEX.R.APP. P. 38.1(h).

2006 & 2003) (providing a person commits the offense of capital murder if she "intentionally or knowingly causes the death of an individual," and the individual is under six years of age). The jury charge instructed the jury to convict Alexander if they found beyond a reasonable doubt that she intentionally or knowingly caused Diamond's death by one of the alleged means listed in the disjunctive. The jury was further instructed that a person acts "intentionally" with respect to a result of her conduct when it is her conscious objective or desire to cause the result; a person acts "knowingly" with respect to a result of her conduct when she is aware that her conduct is reasonably certain to cause the result. *See* Tex. Penal Code Ann. § 6.03(a), (b) (Vernon 2003).

■ The State asserts that under the jury charge, proof that Alexander either intentionally or knowingly caused Diamond's death through any of the alleged means is sufficient, and the jury need not have unanimously agreed on the particular means of commission. We agree. It is well settled that even though an indictment may allege different methods of committing the offense in the conjunctive, it is appropriate for the jury to be charged in the disjunctive and to return a general verdict if the evidence is sufficient to support a finding under any of the alternative theories. *See Kitchens v. State,* 823 S.W.2d 256, 258 (Tex.Crim.App.1991); *Cameron v. State,* 988 S.W.2d 835, 849–50 (Tex.App.-San Antonio 1999, pet. ref'd). Therefore, we must examine the trial evidence to determine whether it is legally and factually sufficient to support the jury's finding that Alexander intentionally or knowingly caused Diamond's death by one of the alternative means.

■ At trial, Elizabeth Youngblood, who was living in Alexander's apartment, testified that she witnessed almost the entire incident between Alexander and Diamond. At about noon on June 5, 2004, Alexander pulled Diamond by the arm from her bedroom into the living room, saying, "this pissy bitch, she pissed again." Alexander made Diamond stand up in front of her while she sat on the couch and "hit her on the bottom quite a few times" with a remote control; Diamond was then made to remain standing there for approximately 30 minutes. Youngblood stated it was not unusual for Diamond to be punished for wetting herself by being made to stand in one place and not move. After 30 minutes, Alexander exclaimed, "Look, look at this bitch. She stood right here and peed on my rug." Alexander then punched Diamond in the chest with a closed fist, knocking her to the floor; Alexander told Diamond to "get up and come here," which she slowly did; Alexander told her she knew better and punched her in the chest a second time, again knocking her down; Alexander called Diamond over again, and told her in a raised voice, "you're going to quit pissing . . .," and punched her a third time, harder, causing Diamond to fly backward and land on her back. Again, Alexander called Diamond back over to the couch. Youngblood stated the first punch was hard, but the third punch was even harder and Diamond was slower to get up and creep back to Alexander. Youngblood asked Alexander, "what are you doing?" but Alexander told her to mind her own business.

After Diamond had stood up in front of the couch for about 15 more minutes, Alexander asked Youngblood to bring her the "black hose" from the hall closet. Youngblood brought a hard plastic vacuum cleaner attachment to Alexander, who tapped it on the ground and pointed it at Diamond, saying, "pissy bitch, you're going to quit pissing in my house. I'm tired of you. I frankly wouldn't give a f* * * if you went

back." Alexander put the attachment down for a while, but after about 15 more minutes she picked it back up and started pounding it on Diamond's feet, repeatedly calling her a "pissy bitch," and saying she was tired of her "pissing in my house." Diamond stayed in place, "whining," as Alexander began hitting her on her legs and then on her back, side and chest. Youngblood stated she knew that it hurt Diamond, and told Alexander, "that's enough. What are you doing?!" But Alexander continued, and started hitting Diamond on her head—the first hits were "hard, too hard to hit a two year old," and the more Alexander hit her, the harder she hit while angrily saying, "quit pissing in my house, pissy bitch. I can't stand you. I wish you would go back." Finally, Alexander hit Diamond on the side of her head, and then the last and hardest hit was to the top of Diamond's head "like a hammer on a nail." Diamond fell down to the floor and did not get up. This time, Alexander did not tell Diamond to get up, or say anything to her. Youngblood went over to check on Diamond, who was not moving at all, while Alexander remained sitting on the couch, telling her, "Girl, you know she's just having a fallout fit." [2]

At that time, which was approximately 3:00 or 3:30 p.m., Youngblood left the apartment to call a friend to pick her up because she "wanted to get out of there;" she was unable to reach the friend, and returned to Alexander's apartment about ten minutes later. When she entered, she saw Alexander walk in from another room carrying Diamond by one arm "like a chicken;" she set her down on the living room floor. Diamond was not moving, and was laying with her legs bent and head turned. Youngblood stated she did not look the same as she had ten minutes before, and looked "worse." Youngblood asked Alexander what was wrong with her, and Alexander again replied she was just having a "fallout fit" and sat on the couch. Youngblood went over and found that Diamond was not breathing; she began performing CPR and "kept trying to get Alexander to call 911." Alexander was just watching. Finally, Alexander instructed Youngblood to tell a story about how Diamond had fallen off the potty and hit herself on the bathroom floor; she got Youngblood to agree to the story before calling 911. After the call, Alexander made one attempt at CPR, but Youngblood performed most of the CPR until the paramedics arrived. Youngblood initially told police the agreed upon story about Diamond falling off the toilet because she was scared, but decided to tell the truth the next day before she found out that Diamond had died, "to get that little girl some justice."

The medical evidence showed that, among many other injuries, Diamond had two potentially fatal injuries caused by blunt force trauma—a significant laceration to her liver and a closed head injury that caused swelling and bleeding in her brain. Dr. Richard Taylor, the pediatric critical care specialist who treated Diamond, testified that upon her arrival at the hospital she was in "complete cardiopulmonary arrest" and had no brain function; she was placed on a mechanical ventilator and given drugs through a continuous IV infusion to stimulate her heart. Dr. Taylor observed very large bruises on both of Diamond's arms extending from her shoulders to her elbows, bruising on her legs extending from the knees to the ankles, a prominent bruise on her forehead, redness

---

**2.** Youngblood described a "fallout fit" as when someone just lays there after getting hit, thinking "get it over with."

and bruising on her chest—only some of which could have been caused by CPR, abrasions on her pubic area, and a bruise on her eyelid with retinal bleeding. A CAT scan revealed brain swelling and a life-threatening liver injury that potentially could have regenerated if she had survived. He stated that a major laceration to the liver takes a "goodly amount of force to cause it," and that bleeding in the back of the eye was evidence of "a lot of force" which probably would have caused Diamond to have blindness or at least impaired vision. Dr. Taylor concluded that all the injuries were non-accidental injuries caused by major trauma equivalent to that of a high speed car accident, and were "highly suspicious of an inflicted injury;" Diamond's injuries could not have been caused by falling off of a training potty or an adult size toilet.

Dr. Kimberly Molina, the medical examiner who performed the autopsy, testified that, apart from the injuries, Diamond was a normal, well developed and well nourished child. Externally, there was swelling and bruising across Diamond's entire forehead, bruising and abrasions lateral to both eyes, a laceration to her inside upper lip, linear diagonal bruising on her back, a large bruise in the center of her chest, linear abrasions above her pelvic bone, plus multiple bruises and abrasions on both arms, both legs and both feet. Her legs showed multiple thin, linear bruises on the upper thighs consistent with a "whipping injury" caused by a cord or open coat hanger, and circular deep bruises on the lower legs and feet caused by a cylinder consistent with the vacuum cleaner attachment recovered from the apartment. Internally, there was hemorrhaging beneath the scalp on the back of her head and across the whole top of her head and forehead, diffused hemorrhaging below the skin of her buttock meaning "the entire buttock was basically one large bruise," a subdural hematoma under the skull with brain swelling, and a hematoma inside the liver. With the exception of the bruising on the back of her head which showed some healing, all of Diamond's injuries were inflicted by blunt force trauma within six hours prior to her hospitalization. The major injuries to her head and liver were consistent with being struck by the hard plastic vacuum cleaner attachment; the liver injury was also consistent with stomping on or punching the upper abdomen; her brain injury was consistent with causing cardiac arrest. Diamond's cause of death was blunt force trauma to the head and thorax, or chest, both of which are very vulnerable areas. Like Dr. Taylor, Dr. Molina opined that these injuries were caused by a "significant amount of force" like that caused by a high speed car accident. Dr. Molina testified that, at a minimum, 26 blows were struck, and that three different instruments were used based on the various linear, circular and diffused bruising patterns. Finally, Dr. Molina stated Diamond's injuries could not have been caused by falling off a training or adult toilet onto a hard floor; rather, they were consistent with "basically being beaten to death."

In addition to the eyewitness testimony and medical evidence, there was testimony about the relationship between Diamond and Alexander in the months preceding her death. Diamond's foster parent, Kevin Godley, testified she lived with his family for approximately nine months during which she was very talkative and active, a typical child. During supervised visits between Diamond and Alexander, he observed their relationship to be "cordial," an "acquaintance-type" relationship with little physical affection or bonding between

them. Diamond's CASA[3] volunteer, Dale Anderson, who first became involved when she was one month old, testified that during supervised visits, he observed a "fringe" relationship between Diamond and Alexander, with very little physical contact except for feeding; Alexander did not play with or encourage Diamond, but there did not appear to be any animosity. When Diamond was living with her foster parents, she was "outgoing, vivacious, a very happy, fun-loving, energetic little girl," and "you could see the love flowing between them, both ways." After Diamond was permanently reunified with Alexander on April 1, 2004, Anderson observed that their relationship remained the same, with very little physical contact or playing, and Diamond had become "withdrawn." Both Godley and Anderson testified that, after the reunification, they lost contact with Diamond and Alexander because Alexander had moved and could not be located for six weeks. Anderson last visited Alexander's home on May 25, at which time Diamond looked okay, but Alexander appeared "very frustrated" with her situation; in Anderson's opinion, the transition was "not going well." Both Godley and Anderson spent hours at the hospital with Diamond on June 4 and 5, but did not see Alexander at the hospital.

Youngblood testified that during the two weeks she lived in Alexander's apartment, she saw that Alexander did not play with Diamond or show her affection, as she did with her infant son; in fact, Alexander would repeatedly say that she "can't stand that little bitch," and she would not care if she "went back." In contrast, Diamond's father, Tarri Washington, Sr., played with and talked to her more, and did most of her feedings. Diamond was being potty trained, and Alexander would often punish her for wetting herself by keeping her in the soiled clothes, or making her sleep on soiled sheets, and having her stand in one place while Alexander played with the baby; however, she would not punish Diamond in front of her father. Diamond acted "scared" of Alexander, and when called she would "creep over, real slow." Youngblood described Diamond as "very shy, very scared, not playful at all," and stated she rarely spoke and just kept to herself.

Finally, Youngblood and various police officers, CPS and EMS personnel testified to Alexander's demeanor immediately after the incident on June 4. Youngblood stated that when she was trying to revive Diamond, Alexander was "just standing there and looking at her," with no facial expression. When the paramedics were working on Diamond, Alexander just stood in one spot, looking on; she never yelled, screamed or cried. In contrast, when Diamond's father arrived just before they loaded her into the Air Life helicopter, he was upset and angry, asking, "Oh my God, what ... happened ... my daughter, my daughter." One of the paramedics similarly testified that the father's reaction was very emotional, hysterical, "what you would expect," while Alexander's reaction was the opposite. The officers who testified stated that Alexander had a "neutral demeanor," "sort of like a passerby;" she was just standing there observing, was not crying and did not seem concerned about the child. In contrast, Youngblood, who was caring for the infant boy, was more emotional and concerned, and trying to be helpful. When the father arrived, he was "very concerned and upset." When Alexander returned to her apartment after being questioned at the police station, she did not ask to be taken to the hospital to see Diamond, but was more concerned about

---

**3.** CASA is an abbreviation for Child Advocates of San Antonio, Inc.

whether anyone had stolen her TV. Finally, the CPS caseworker who came to the apartment the next day to interview Alexander and remove the infant boy testified that, during the interview, she received a call from the hospital stating Diamond was deteriorating and about to be removed from life support. Both Diamond's father and Youngblood began to cry, while Alexander just looked down at the floor. When she offered to take them immediately to the hospital, Alexander declined and indicated she would find a ride.

Alexander's intent may be inferred from her actions and statements during and after the incident, as well as from the extent of Diamond's injuries, the relative size and strength between Alexander and Diamond, and their relationship. *See* TEX.CODE CRIM. PROC. ANN. art. 38.36(a) (Vernon 2005); *see also Patrick v. State*, 906 S.W.2d 481, 487 (Tex.Crim.App.1995); *Duren v. State*, 87 S.W.3d 719, 724 (Tex.App.-Texarkana 2002, pet. stricken) (fact finder may use common sense and apply common knowledge, observation, and experience when giving effect to reasonable inferences from the evidence and may infer defendant's knowledge or intent from acts, words and conduct). There was undisputed evidence that the relationship between Diamond and Alexander was neutral, at best, and Alexander showed no remorse or concern for Diamond after she became unresponsive and was taken to the hospital. Even when told Diamond was about to die, Alexander had no reaction; in comparison, Diamond's father and Youngblood were emotional and upset. Further, the evidence showed that Alexander lied about what happened. Alexander's explanation that Diamond fell off the toilet was inconsistent with the medical evidence; both medical experts stated it was "not possible" for Diamond to sustain such significant injuries in such a fall. On the other hand, the medical evidence corroborated Youngblood's trial testimony about the types of injuries inflicted, the instruments used, and the time frame during which they were inflicted. The degree of force used, equivalent to a high speed car accident, and the fact that vulnerable areas like the head and abdomen were targeted, are also supportive of an inference that Alexander intentionally or knowingly killed Diamond, and was not merely intending to discipline her.[4] We conclude that the evidence is legally and factually sufficient to support the jury's finding that Alexander intentionally or knowingly caused Diamond's death by striking her with her hand, a plastic tube or unknown object, or against an unknown object. *See Duren*, 87 S.W.3d at 724–27; *see also Montgomery v. State*, 198 S.W.3d 67, 87–88 (Tex.App.-Forth Worth 2006, pet. ref'd); *Hernandez v. State*, 118 S.W.3d 469, 472–77 (Tex.App.-Eastland 2003, pet. ref'd). Alexander's first issue is overruled.

### Change of Venue

In her second issue, Alexander contends the trial court erred in denying her motion for a change of venue under article 31.03 of the Texas Code of Criminal Procedure. TEX.CODE CRIM. PROC. ANN. art. 31.03 (Vernon 2006). We review the court's refusal to grant a change of venue for an abuse of discretion, and will not disturb the court's ruling as long as it falls within the zone of reasonable disagreement. *Renteria v. State*, 206 S.W.3d 689, 709 (Tex.Crim.App.2006).

Article 31.03(a) provides that a change of venue may be granted on the defendant's written motion, accompanied by affi-

---

4. TEX. PENAL CODE ANN. § 9.61(a) (Vernon 2003) (justification of parent-child discipline is not available when deadly force is used).

davits, for either of the following causes: "(1) [t]hat there exists in the county where the prosecution is commenced so great a prejudice against [the defendant] that [s]he cannot obtain a fair and impartial trial; and (2)[t]hat there is a dangerous combination against [her] instigated by influential persons, by reason of which [s]he cannot expect a fair trial." Tex.Code Crim. Proc. Ann. art. 31.03(a). Alexander alleged both grounds in her motion, although the majority of the motion focused on pre-trial publicity; she attached three affidavits in support. The State filed a reply with controverting affidavits challenging the means of knowledge to support the statements made in the affidavits attached to Alexander's motion. *See* Tex. Code Crim. Proc. Ann. art. 31.04 (Vernon 2006) (submission of controverting affidavits attacking the credibility of the affiants for a change of venue forms an issue to be tried by the trial judge); *DeBlanc v. State,* 799 S.W.2d 701, 704 (Tex.Crim.App.1990).

■■■■ A defendant seeking a change of venue bears a heavy burden to prove the existence of "such prejudice in the community that the likelihood of obtaining a fair and impartial trial jury is doubtful." *Renteria,* 206 S.W.3d at 709 (citing *De-Blanc,* 799 S.W.2d at 704). For a defendant to obtain a change of venue based on pre-trial publicity, she must show that the publicity about the case is "pervasive, prejudicial and inflammatory;" in other words, she must establish an "actual, identifiable prejudice attributable to pretrial publicity on the part of the community from which members of the jury will come." *Id.* (quoting *DeBlanc,* 799 S.W.2d at 704); *Salazar v. State,* 38 S.W.3d 141, 150 (Tex. Crim.App.2001). Just because a case receives a high level of media attention does not automatically establish such prejudice that a defendant is entitled to a change of venue. *DeBlanc,* 799 S.W.2d at 704 (citing

*Murphy v. Florida,* 421 U.S. 794, 801, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975)) (noting that jurors do not have to be totally ignorant of the facts and issues in a particular case). The introduction of various witnesses' testimony at the venue hearing creates a factual dispute for the trial court to resolve as to whether the defendant can receive a fair trial in the community. *Renteria,* 206 S.W.3d at 709.

■■■■ At the hearing held on November 9, 2005, Alexander presented four witnesses in support of her request for a change of venue, and admitted into evidence approximately 30 news articles referring to the case. David Reilly, Chief Juvenile Probation Officer for Bexar County, testified that in response to a court order he conducted an investigation and authored a report on the flaws in the Bexar County child protective system as a whole and in particular, the CPS case related to Diamond. Reilly stated the CPS investigation was triggered by the recent deaths of Diamond and another child, Jovonie Ochoa. While the report mentioned Kimberly Alexander in discussing the history of the CPS case involving Diamond, it contained minimal information about the facts and circumstances of Diamond's death and was wholly independent of the pending criminal investigation; Reilly testified that the main thrust of the report was to recommend improvements in CPS procedures. During the 60–day investigation, there was a "steady stream of media inquiries" about the investigation, almost daily, but they subsided after the release of the report in August 2004; the release was accompanied by a press conference. The majority of the report's recommendations were incorporated into legislation introduced by State Representative Carlos Uresti, and Reilly testified at several legislative hearings on reforming the CPS system. Reilly did not know how many peo-

ple in the community had knowledge of the report.

Representative Uresti, who was the Chairman of the House Human Services Committee, testified that during the second half of 2004 and early 2005 he introduced legislation and conducted hearings in Austin concerning reform of the CPS system; he stated the reform efforts were triggered primarily by the Ochoa case. Uresti did not recall whether the names Diamond or Kimberly Alexander were mentioned during the hearings or related press conferences and interviews, although an enlarged photograph of Diamond was displayed at one press conference and her name was probably mentioned then. Uresti stressed, however, that his committee's focus was on the system, not on any one particular case, and that he never discussed the details of Diamond's case in the media because he considered it inappropriate. Uresti confirmed that the media was very interested in the efforts to reform the CPS system; he further opined that the Diamond Alexander case had attracted more publicity than the average criminal case in Bexar County, but less than the Jovonie Ochoa case which was tried in Bexar County. Uresti could not say whether Alexander could receive a fair trial in Bexar County.

Next, Elizabeth Fisher, an attorney who represented Alexander in the CPS case involving Diamond and her other children, testified that the media was present at several CPS hearings held after Diamond's death, and she anticipated heavy media interest in the upcoming jury trial involving termination of Alexander's rights to her other children. Fisher opined that Alexander could not receive a fair trial in Bexar County because "the jury pool is saturated with all the media coverage" and some people in the community that she knows have made comments that presume Alexander is guilty; however, she could not say whether any certain number of people in the community had formed an opinion about the case. Finally, Jesse Olson, Alexander's adopted brother, testified that he had heard some people talking about the case who assumed that Alexander was guilty, he did not believe the media coverage of the case was fair, and did not believe she could get a fair trial in Bexar County. The State relied on affidavits and certifications admitted into evidence showing that the estimated population of Bexar County for 2005 was over 1.5 million people, and the Bexar County jury pool exceeded one million individuals, with 867,981 registered voters as of October 17, 2005.

At the conclusion of the hearing, the trial court found that no evidence was presented showing that any of the media coverage was "anything but accurate, objective and informative." Finding no evidence of any inflammatory, sensational or inaccurate, and therefore prejudicial, publicity about the case, the court denied the motion for change of venue. *See Renteria,* 206 S.W.3d at 709.

We conclude the trial court did not abuse its discretion in denying Alexander's motion for change of venue. While Olson and Fisher testified to their opinions that Alexander could not receive a fair trial in Bexar County based on their interaction with a limited group of citizens, Uresti and Reilly declined to express an opinion about how many people in the community knew about Alexander's case. Moreover, on cross-examination, the State developed evidence that the publicity concerning the CPS reform triggered in part by Diamond's case had decreased in the months leading up to Alexander's trial, and that the newspaper and television stories that did discuss Alexander's case were factually accurate, and not inflammatory or prejudi-

cial. The record adequately supports the court's finding that Alexander failed to prove she could not receive a fair trial in Bexar County because the pre-trial publicity devoted to her case was pervasive, prejudicial or inflammatory.[5] *See Salazar*, 38 S.W.3d at 150; *see also Stanley v. State*, 664 S.W.2d 746, 753 (Tex.App.-San Antonio 1983, pet. ref'd). Accordingly, we overrule Alexander's second issue.

### *Admission of Specific Instances of "Misconduct"*

■ In her third issue, Alexander contends the trial court erred in admitting evidence of specific instances of misconduct during the guilt/innocence phase in violation of Rule 404(b).[6] Tex.R. Evid. 404(b) (providing that evidence of other crimes, wrongs or acts is not admissible to prove character conformity). Specifically, Alexander complains of evidence showing that: (1) she told Youngblood that she had "access to guns and drugs;" (2) she was the subject of a CPS investigation and CPS had removed Diamond from her care; and (3) she was a "bad mother" to Diamond. We review a trial court's decision to admit or exclude evidence for an abuse of discretion, and will not reverse unless the court's ruling falls outside the zone of reasonable disagreement. *Torres v. State*, 71 S.W.3d 758, 760 (Tex.Crim.App.2002). The erroneous admission or exclusion of evidence is not reversible error unless it affects a substantial right of the defendant.

Tex.R.App. P. 44.2(b); *Johnson v. State*, 43 S.W.3d 1, 4 (Tex.Crim.App.2001) (a substantial right is affected when the error has a substantial and injurious effect or influence in determining the jury's verdict).

■ First, the record reflects that the trial court sustained Alexander's objection and instructed the jury to disregard Youngblood's statement that she lied about what happened because she was scared of Alexander since she was "always talking about how she has access to guns and drugs." A prompt instruction to disregard will ordinarily cure error associated with an improper question and answer, even if it involves an extraneous offense or bad act. *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex.Crim.App.2000); *Colburn v. State*, 966 S.W.2d 511, 520 (Tex.Crim.App.1998) (jury is presumed to have followed trial court's instructions). A mistrial is required only when the improper question is "clearly prejudicial to the defendant and is of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors." *Ladd v. State*, 3 S.W.3d 547, 567 (Tex.Crim.App. 1999) (asking of improper question seldom requires a mistrial because instruction to disregard cures any harm in most cases). Here, Youngblood's answer was an isolated reference to "guns and drugs" which was not repeated during trial, and there-

---

5. Counsel for Alexander did not argue the "dangerous combination" ground at the hearing, and the court did not make a specific finding on that ground when it denied the motion. Moreover, Alexander does not cite that ground on appeal and the record contains no evidence of a "dangerous combination of influential persons" against Alexander personally. *See* 42 Dix and Dawson, *Texas Practice: Criminal Practice & Procedure* § 25.22 (2d ed.2001) (noting that the "dangerous combination" must be against the defendant individually, and does not encompass a general organized effort in the community

to suppress the type of crime with which the defendant is charged); *see also Hussey v. State*, 590 S.W.2d 505, 506 (Tex.Crim.App. [Panel Op.] 1979).

6. Alexander includes an argument on appeal that any probative value was outweighed by the danger of unfair prejudice; however, she did not raise a Rule 403 objection in the trial court. Tex.R. Evid. 403. Therefore, no Rule 403 issue was preserved for appellate review. Tex.R.App. P. 33.1(a).

fore it was not so prejudicial that the court's instruction to disregard could not cure the error; the court did not abuse its discretion in denying Alexander's request for a mistrial. *Id.*

Second, evidence was permitted showing that CPS removed Diamond from Alexander's care shortly after her birth, but the reasons for removal were not revealed to the jury. There was also testimony that there was an open CPS case involving Diamond, and that CPS had reunified Diamond with Alexander two months before her death. Even if such evidence could be considered a "bad act," or instance of "misconduct," defense counsel did not object to all of the testimony concerning the CPS case involving Diamond; because the same evidence was admitted without objection, any error was waived. *Moore v. State,* 999 S.W.2d 385, 402 (Tex.Crim.App.1999). Moreover, the removal and reunification evidence was a form of relationship evidence that showed the prior and existing relationship between Diamond and Alexander; thus, it was admissible under article 38.36(a) of the Code of Criminal Procedure. Tex.Code Crim. Proc. Ann. art. 38.36(a) (providing that testimony showing the previous relationship in existence between the accused and the deceased is admissible in a murder prosecution).

Finally, there was evidence from several sources that Alexander did not interact with Diamond in a loving, motherly way. This testimony was not evidence of an extraneous "bad act," but rather evidence concerning the existing relationship between Alexander and Diamond at the time of the murder, which was admissible under article 38.36(a). *Id.; Garcia v. State,* 201 S.W.3d 695, 703 (Tex.Crim.App. 2006). Further, Alexander did not object to all of the evidence concerning her relationship with Diamond, and any error was therefore waived. Tex.R.App. P. 33.1(a); *Moore,* 999 S.W.2d at 402.

### *Comment on Post–Arrest Silence*

Finally, in her fourth issue, Alexander asserts the prosecutor deliberately commented on her post-arrest silence by asking Detective Titus whether Alexander "admitted any wrongdoing" during her first interview. The trial court promptly sustained Alexander's objection and instructed the jury to disregard the question, which was not answered by Titus. Alexander's request for a mistrial was denied. As with the statement by Youngblood discussed *supra,* we find nothing in the record to indicate that any prejudice arising from the prosecutor's question could not be cured by the prompt instruction to disregard. *Ovalle,* 13 S.W.3d at 783; *Colburn,* 966 S.W.2d at 520; *Wesbrook v. State,* 29 S.W.3d 103, 115 (Tex. Crim.App.2000) (prosecutor's single inappropriate reference to defendant's statement, which was not admitted into evidence, was not so flagrant an error that it was incapable of being cured by prompt instruction to disregard). Further, the court did not abuse its discretion in denying the request for a mistrial. *Ladd,* 3 S.W.3d at 567. Accordingly, we overrule this issue.

Based on the foregoing reasons, we affirm the trial court's judgment.