# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
## NO. 03-06-00569-CR
---

**Rudolph Rodriguez, Appellant**

**v.**

**The State of Texas, Appellee**

---
### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT
### NO. D-1-DC-05-302061, HONORABLE FRED A. MOORE, JUDGE PRESIDING
---

## M E M O R A N D U M   O P I N I O N

A jury found Rudolph Rodriguez guilty of recklessly causing injury to B.B., a child.
*See* Tex. Penal Code Ann. § 22.04(a)(1) (West Supp. 2008). On appeal, Rodriguez contends that
the evidence presented during his trial is legally and factually insufficient to support his conviction.
We will affirm the judgment of the district court.

## BACKGROUND

At the time of the alleged offense, Rodriguez was living with Renelle Van and her
two sons, J.B. and B.B. J.B. is the son of Rodriguez and Van, but Rodriguez is not the father of B.B.
B.B. was four years old at the time.

For several months before the incident, Rodriguez, Van, B.B., and J.B. were
living at Rodriguez's parents' home. Usually, Rodriguez, Van, J.B., and B.B. slept in Rodriguez's
room, although B.B. would sometimes sleep in other rooms in the house. When B.B. slept in

Rodriguez's room, he slept on a pallet on the floor. In addition to the beds, there was a dresser and a set of exercise weights located inside Rodriguez's room. Various people went into the room in order to use the weights.

One night in September 2005, Van went to Rodriguez's room in order to put J.B. and B.B. to bed, and she did not come out of the room until almost two hours later. On that night, she made a pallet for B.B. to sleep on next to her and Rodriguez's bed. After Van left the bedroom, she and Rodriguez went outside to sit on the porch. Shortly thereafter, Van asked Rodriguez to get her a glass of water, and Rodriguez went inside to get the water. Because it was dark outside, Rodriguez also decided to retrieve a flashlight from his bedroom.

When Rodriguez entered the room, he noticed that B.B. was still awake. According to Rodriguez, B.B. began asking to see Van, and Rodriguez repeatedly told B.B. to go back to bed. Further, Rodriguez communicated that he tried to physically force B.B. to lay back down but that B.B. jerked back and then fell.

Shortly after this happened, Van went back inside the house and heard Rodriguez calling from the bedroom. When Van arrived at Rodriguez's bedroom, she first saw Rodriguez standing and then saw B.B. laying on his pallet sideways and moaning. After seeing B.B., Van asked Rodriguez what had happened, but he did not really respond and was noticeably upset. When Van picked up B.B. to carry him, she noticed that his ear was bleeding.

Van carried B.B. to Rodriguez's parents' bedroom and asked Rodriguez's mother, Laurel Flores, for help. Shortly thereafter, Laurel drove Van and B.B. to the hospital and dropped them off. Rodriguez did not go to the hospital. While B.B. was hospitalized, he was examined by Dr. George Edwards, who was a member of the hospital's child assessment team. Members of the

2

team are consulted when a treating physician believes that a child has been abused, and the team works with social workers and law enforcement to help determine whether abuse has occurred.

According to Rodriguez, after Van left with B.B., he returned to his room to determine what had happened. Rodriguez said that after he went into his room, he lifted B.B.'s pallet off the ground, noticed that an exercise weight was under the blanket, and concluded that B.B. must have hit his head on the weight. Approximately fifteen minutes after B.B. was taken to the hospital, Rodriguez left his parents' house and went to stay with his sister, Monique Rodriguez, for the evening. When Laurel returned home, Rodriguez was already gone. Shortly after getting home, Laurel went into Rodriguez's bedroom and noticed that one of the weights in his room had blood on it.

After B.B. was taken to the hospital, various police officers investigated the incident, including Detective Catherine Johnson, who works in the child abuse unit, and Officer Enrique Flores. Flores and Johnson each had telephone conversations with Rodriguez, but despite repeated requests by Flores and Johnson, Rodriguez never met with either officer in person to discuss the incident. The police did not search Rodriguez's bedroom until hours after the incident.

Eventually Rodriguez was arrested and was charged with causing bodily injury to a child. Rodriguez pleaded not guilty. During his trial, he, Van, Van's mother (Melissa Van), B.B., Laurel, Monique, Dr. Edwards, Detective Johnson, and Officer Flores all testified. After the trial concluded, the jury found Rodriguez guilty of the crime of recklessly causing injury to a child and sentenced him to twenty years' imprisonment. Rodriguez appeals his conviction.

3

**STANDARD OF REVIEW**

In his sole issue on appeal, Rodriguez contends that the evidence presented at trial was legally and factually insufficient to support his conviction.

The jury "is the exclusive judge of the facts proved, and of the weight to be given to the testimony" presented during a criminal trial, Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979), and may choose to believe all, some, or none of the evidence presented, *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995). Moreover, resolution of any conflicts in the evidence presented "is within the exclusive province of the jury." *Id.*

For these reasons, when determining whether the evidence presented at trial is legally sufficient to support a conviction, appellate courts must not act as an additional juror. *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). Instead, courts must "consider all of the record evidence in the light most favorable to the jury's verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational jury could have found the accused guilty of all of the elements of the offense beyond a reasonable doubt." *Ladd v. State*, 3 S.W.3d 547, 556-57 (Tex. Crim. App. 1999). It is not necessary for each fact to independently point to guilt, and the evidence is sufficient provided that the cumulative force of the incriminating evidence justifies the verdict. *Barnes v. State*, 876 S.W.2d 316, 330 (Tex. Crim. App. 1994). In performing its analysis, a court should resolve inconsistent testimony in favor of the verdict reached by the jury. *Moreno*, 755 S.W.2d at 867.

In a factual-sufficiency review, on the other hand, we must view all of the evidence in a neutral light and set the judgment aside only when the evidence is so weak that the verdict seems

4

clearly wrong or manifestly unjust or when the verdict is against the great weight and preponderance of the evidence. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). In making this determination, an appellate court must be appropriately deferential to the verdict in order to avoid substituting its judgment for that of the jury. *Vasquez v. State*, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002). The jury is the sole judge of the credibility of testimony presented at trial and of the weight to be given to the witnesses' testimony. *Id.*

## DISCUSSION

The jury found that Rodriguez recklessly caused bodily injury to B.B. The penal code states that a person commits the crime of injuring a child "if he . . . recklessly . . . by act . . . causes to a child . . . serious bodily injury." Tex. Penal Code Ann. § 22.04(a)(1). Further, the penal code explains what is meant by a reckless mental state. *Id.* § 6.03(c) (West 2003). In particular, the code provides as follows:

> A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

*Id.*

During the trial, evidence was presented regarding Rodriguez's relationship with B.B. and regarding the events leading up to the incident in which B.B. was injured. In his testimony, Rodriguez stated that he tried his best to take care of B.B. and stated that he never physically disciplined B.B. Rather, he testified that he would discipline B.B. by sending him to time out.

5

Rodriguez's mother, Laurel, and his sister, Monique, also testified that they never saw Rodriguez spank B.B. or use any type of physical discipline. Laurel and Monique also stated that Rodriguez often played with B.B., and Laurel stated that Van had asked Rodriguez to care for B.B. on many occasions. Further, Laurel testified that Rodriguez could never intentionally hurt a child and that Rodriguez would never try to hurt B.B.

Regarding what led up to B.B. becoming injured, Rodriguez testified that after he entered his room to get a flashlight, he noticed that B.B. was awake. Further, Rodriguez stated that B.B. sat up and asked for his mother. Rodriguez revealed that B.B. sat up three different times, that Rodriguez told B.B. to go back to sleep each time, and that Rodriguez tried to make B.B. lay down each time by placing his hands on B.B.'s chest and back and by pushing on B.B.'s chest to make him lay down. Rodriguez also testified that on each successive attempt to get up, B.B.'s requests to see his mother got louder. Moreover, Rodriguez stated that after B.B. sat up for the third time, Rodriguez held B.B. down for a while to encourage B.B. to go back to sleep. Further, Rodriguez testified that B.B. stayed down and was quiet after Rodriguez got up to leave but also stated that as he was leaving, B.B. stood all the way up and asked to see his mother again.

In addition, Rodriguez testified that after B.B. stood up, Rodriguez got close to B.B., told B.B. that he "need[ed] to lay down," and grabbed B.B. by his shoulders in order to try and make B.B. lay down. However, Rodriguez stated that after he grabbed B.B. by the shoulders, B.B. "jerked away" from him and then slipped and fell and must have hit his head on a weight. Rodriguez testified that immediately after falling, B.B. started crying. Rodriguez stated that he was not going to try to "shove [B.B.] or nothing" and that he did not push B.B. down.

However, evidence was introduced at trial demonstrating that B.B.'s injuries could not have occurred from simply falling and hitting his head; on the contrary, this evidence showed

6

that the types of injuries sustained by B.B. were traumatic in nature and were caused by extreme force. Specifically, Dr. Edwards testified that when B.B. was admitted to the hospital, he had multiple bruises on his head, neck, back, shoulder, and on his legs. Further, he testified that a portion of B.B.'s skull had separated or "split open" along the line where two skull bones fuse as children develop. In addition, he stated that B.B. had another skull fracture at the base of his skull. Moreover, Dr. Edwards testified that B.B.'s scalp was bleeding extensively and was swollen and that blood had pooled into B.B.'s middle ear and also inside his skull. Dr. Edwards referred to the last injury as a subdural hematoma.

When describing the severity of these injuries, Dr. Edwards stated that the subdural hematoma was a serious and potentially life-threatening injury. Further, he testified that the skull separation injury, the skull fracture at the base of B.B.'s skull, and the pooling of blood inside the skull and ear canal were all traumatic injuries. In particular, he testified that the presence of a subdural hematoma indicated that enough force had been applied to B.B.'s head to "sheer" the veins that go through the sinuses. Further, he said that these types of injuries were not typically seen in household falls because they are "high energy impact" injuries, more typically seen in car crashes or falls from significant heights. Finally, he testified that based on the accounts of what had happened, he believed that it was highly unlikely that the injuries could have been sustained even from a fall as high as four feet.[1]

---

[1] During trial, testimony was introduced stating that B.B. had fallen off his skateboard a few days before he was taken to the hospital and that some of the bruising observed may have occurred during that fall. However, various witnesses, including Rodriguez, testified that B.B. was behaving normally days after falling off his skateboard and that B.B. was behaving normally right before Rodriguez entered the bedroom on the night B.B. was taken to the hospital. Moreover, Dr. Edwards testified that his examination of B.B. revealed that the injuries to B.B.'s head occurred recently.

During the trial, evidence was presented demonstrating that B.B. was acting normally until his interaction with Rodriguez, and Rodriguez does not dispute that he was the last person to interact with B.B. before he was injured. Moreover, although Rodriguez stated that he did not push B.B., he did admit that he was about to try "to make [B.B.] go down." Further, Rodriguez later admitted that it was possible that he did push B.B. and confirmed that he was not sure if he had pushed B.B. In addition, Rodriguez admitted that he was getting "a little agitated. [B.B.] wouldn't listen."[2] Moreover, Van testified that after she went to the hospital with B.B., Rodriguez called her and told her that he had pushed B.B. down in order to make him go to sleep. Melissa, Van's mother, also testified that she talked to Rodriguez over the phone while she was at the hospital and that he said he "didn't mean to hurt [B.B.] *that bad*." (Emphasis added.) Detective Johnson testified that Rodriguez made a similar statement to her when she talked to Rodriguez on the phone.

In addition to this testimony, B.B. also testified regarding the incident. Although he admitted that he did not remember a lot about the night he was injured and was inconsistent with the details of what happened, B.B. affirmatively testified that Rodriguez hurt him.[3] Detective Johnson

---

[2] Monique also testified that Rodriguez would get "impatient" with B.B. In addition, Rodriguez testified that after J.B. was born, B.B. became very possessive of his mother and did not want Rodriguez near his mother.

[3] In his brief, Rodriguez points out that B.B. provided inconsistent testimony regarding his sleeping arrangements and the number of times that Rodriguez hit him, that he stated that he forgot where he was hit but then testified regarding specific locations where Rodriguez allegedly punched him, that he testified Rodriguez hit him on parts of his body that showed no evidence of injury, and that he said that he hurt his head when he fell on a table. For this reason, Rodriguez insists that B.B.'s testimony is entirely unbelievable.

In reviewing the sufficiency of the evidence presented at trial, our task is not to usurp the jury's role in making credibility determinations and in resolving inconsistencies in the evidence presented. Moreover, although some of B.B.'s testimony was contradictory, portions of his testimony describing locations where Rodriguez had punched him were corroborated by the

provided similar testimony. Specifically, she stated that when she interviewed B.B. a few days after he was injured, he could not remember all of the details surrounding the incident but did state that Rodriguez had hurt him.

Furthermore, testimony was also introduced demonstrating that Rodriguez left the scene of the incident shortly after B.B. was taken to the hospital and that he was afraid to talk to the police. *Cf. Lee v. State*, 176 S.W.3d 452, 462 (Tex. App.—Houston [1st Dist.] 2004) (explaining that evidence of flight or escape can support inference of guilt), *aff'd*, 206 S.W.3d 620 (Tex. Crim. App. 2006). As mentioned earlier, Rodriguez testified that he left the scene approximately fifteen minutes after B.B. was taken to the hospital. Further, Rodriguez stated that he did not go back to his house or to the hospital because the police were present at both locations. In her testimony, Monique confirmed that Rodriguez was scared of going to the hospital. When asked why Rodriguez left the house, Laurel admitted that Rodriguez said that he left because "[h]e was scared . . . [of] [g]oing to jail" and that he thought that he was going to go to jail. Further, when describing his phone conversation with Rodriguez, Officer Flores testified that Rodriguez made the following statements: "Well, the only reason you want to talk to me is [to] put handcuffs on me" and "[B.B.] started bleeding and I got scared and I left the house."

In light of the preceding, we must conclude that the evidence was legally and factually sufficient to support the jury's determination that Rodriguez injured B.B. while being aware of and

---

testimony of Dr. Edwards and Van. In particular, B.B. stated that Rodriguez had repeatedly punched various parts of his body, including his legs and shoulder, on the night of the incident. When Dr. Edwards evaluated B.B.'s injuries, he described bruises to B.B.'s legs and shoulder. Furthermore, in her testimony, Van described bruises to B.B.'s legs and shoulder that she discovered on B.B.'s body after the incident.

disregarding a substantial risk to B.B. and that his decision to disregard that risk constituted a gross deviation from the standard of care that an ordinary person would exercise under the circumstances.

In addition to generally challenging the legal and factual sufficiency of the evidence presented, Rodriguez raises specific arguments as to why he believes that the evidence is legally and factually insufficient. First, Rodriguez asserts that the State failed to present evidence that he was aware that there was a weight near B.B.'s bed and that, without proof of this knowledge, Rodriguez could not have been aware that B.B. could have been injured. Accordingly, Rodriguez insists that the evidence was legally insufficient to support his conviction. Alternatively, Rodriguez claims that even if the evidence was legally sufficient, it was factually insufficient to support a determination that he was aware of any potential danger to B.B. because the evidence demonstrated that the weight was underneath B.B.'s pallet and was covered by a blanket. For these same reasons, Rodriguez asserts that the evidence is legally and factually insufficient to show that he "consciously disregarded a risk of bodily injury to" B.B. or that his conduct "constituted a gross deviation from the standard of care that an ordinary person would exercise" under the circumstances. *See* Tex. Penal Code Ann. § 6.03(c).

In resolving this issue, it is not necessary to determine whether sufficient evidence was presented showing that Rodriguez knew that there was a weight near B.B.'s pallet. In other words, in light of the testimony demonstrating that B.B. sustained a high-energy impact, that Rodriguez was the last person to interact with B.B. before he was injured, and that Rodriguez pushed B.B., we need not specifically address whether Rodriguez was aware that a weight was near or under B.B.'s pallet at the time B.B. was injured in order to conclude that the evidence is legally and

factually sufficient to support his conviction for recklessly causing injury to a child. However, we do note that although Rodriguez testified that he discovered a weight underneath B.B.'s pallet *after* B.B. had been injured, he also testified that he was aware that there was a weight set in the room. He also stated that on the night of the incident, B.B. was laying next to the location where the weights were usually kept. Furthermore, although he testified that the weights were usually kept in the same location, he also stated that he was aware that the weights were sometimes left in other locations in the room. Similarly, Laurel testified that the weights were often scattered around the bedroom. In addition, Rodriguez testified that it was dark in the room when he was attempting to force B.B. to lay back down and go to sleep.

Second, Rodriguez contends that the evidence presented at trial was factually insufficient to support a determination that he had engaged in criminal conduct and that the only evidence indicating that he may have committed a crime came from Dr. Edwards, who testified that the injuries B.B. sustained were "not accidental." During his testimony, Dr. Edwards was asked whether B.B.'s injuries could have been accidentally caused. In his answer, Dr. Edwards stated that in determining whether injuries might be accidental in nature, people should consider whether the injury is consistent with the account of what happened. In light of this and Rodriguez's assertion that B.B. was injured after he fell, Dr. Edwards testified that Rodriguez's account was not consistent with the severe injuries B.B. sustained and, therefore, concluded that the "injuries were not accidental." Essentially, Rodriguez complains that Dr. Edwards was not at the scene and cannot evaluate whether Rodriguez's conduct was criminal in nature.

11

Contrary to Rodriguez's assertion, Dr. Edward's statement was not the only testimony indicating that criminal activity had occurred. As described earlier, during the trial, Dr. Edwards provided uncontested testimony regarding the unusual nature of B.B.'s injuries and explaining that the types of injuries sustained occur in high-energy impacts and were extremely unlikely to have occurred during a fall from four feet or less. *Cf. Alexander v. State*, 229 S.W.3d 731, 740 (Tex. App.—San Antonio 2007, pet. ref'd) (explaining that degree of force used, "equivalent to a high speed car accident," supported inference that defendant intentionally or knowingly killed victim). Moreover, Van, Laurel, and Rodriguez also testified regarding the severity of B.B.'s injuries. Van testified that when she found B.B., he was moaning, shaking, and bleeding and that he was not speaking. In addition, she stated that blood was draining from B.B.'s ear, that B.B. had a busted lip, and that B.B. was vomiting. Laurel testified that when Van brought B.B. to her bedroom, B.B. was very hurt and was bleeding. Furthermore, Rodriguez stated that right after B.B. was injured, B.B. did not respond to any of his questions, was making "weird noises," and did not look at him. Rodriguez testified that he became concerned when he saw how much B.B. had been bleeding. Finally, Van testified that Rodriguez told her that he pushed B.B., and Rodriguez admitted that he may have pushed B.B.

## CONCLUSION

For all these reasons, we conclude that the evidence was legally and factually sufficient to support the jury's determination. Accordingly, we overrule Rodriguez's issue on appeal and affirm his conviction.

_____

David Puryear, Justice

Before Justices Patterson, Puryear and Pemberton

Affirmed

Filed:   March 19, 2009

Do Not Pubish