**Yesenia HERNANDEZ, Appellant,**

v.

**STATE of Texas, Appellee.**

**No. 11–02–00300–CR.**

Court of Appeals of Texas, Eastland.

Aug. 29, 2003.

Russ Henrichs, Dallas, for appellant.

Bill Hill, District Attorney, Tammy Ardolf, Asst. Criminal District Attorney–Appellate Section, Dallas, for appellee.

Panel consists of WRIGHT, J., and McCALL, J., and DICKENSON, S.J.*

Opinion

BOB DICKENSON, Senior Justice (Retired).

The jury found that Yesenia Hernandez was guilty of capital murder.[1] The State did not seek the death penalty, and the trial court assessed the mandatory punishment of imprisonment for life.[2] We affirm.

## The Indictment

The indictment charged that, on or about August 29, 2001, appellant did unlawfully, intentionally, and knowingly cause the death of her son, Roy Aguilera:

> [A]n individual, hereinafter called deceased, by striking deceased with a broom handle, a deadly weapon, and by shaking deceased with her hand and hands, a deadly weapon, and by striking deceased with and against an object, a deadly weapon, the exact nature and description of which is unknown to the Grand Jurors, and any combination thereof, and the deceased was at the

---

* Bob Dickenson, Retired Justice, Court of Appeals, 11th District of Texas at Eastland sitting by assignment.

1. See TEX. PENAL CODE ANN. § 19.03 (Vernon 2003). The offense was "capital murder" because the victim was under six years of age.

2. See TEX. PENAL CODE ANN. § 12.31 (Vernon 2003).

time of the offense under six years of age.

## Points of Error

Appellant presents eight points of error. She argues in Points of Error Nos. 1 and 2 that the trial court erred in admitting proof of the written statements which she signed, and she argues in Points of Error Nos. 3 and 4 that the trial court erred in admitting proof of the oral statements which she made. Appellant argues in Points of Error Nos. 5 and 6 that the evidence is "legally" insufficient and "factually" insufficient to prove that she intentionally caused the death of her son. She argues in Point of Error No. 7 that the trial court erred in permitting "gruesome photographs" to be introduced into evidence and in Point of Error No. 8 that she was not given proper notice of the "extraneous offenses."

## The Evidence

The jury heard testimony from 16 witnesses, all of whom were called by the State. There were no witnesses for the defense.

1. Kelly Fowler, a caseworker for Child Protective Services (CPS), testified about the foster care which appellant's son and daughter received and about the reason that CPS had taken the children from appellant and her boyfriend. Appellant sued CPS to get the children back, and Fowler said the jury in that case "sent the children home."

2. Rebecca Calvo, a Spanish-speaking investigator for CPS, had been the caseworker when CPS worked on the prior case involving appellant and her children. Calvo identified a picture of appellant's son and testified that he was a "beautiful baby," that he was "well-behaved," that he "smiled a lot," and that she never saw him crying while he was in foster care. Calvo also testified that she was the one who returned the two children to appellant after the jury trial in the earlier case. Calvo said that the caseworkers felt like "the kids were at risk" and that they would get another call concerning those children. Calvo also testified that she went to the hospital to see the child when she got a call that he was in the hospital in critical condition. Since she knew appellant from the earlier case, Calvo was the one who was called to translate when appellant was arrested and taken to jail in connection with her son's injuries. Relevant portions of her testimony read as shown:

Q: Why did you-all go to the jail?

A: We were aware that [appellant] was pregnant and she was close to delivering her baby, and we needed some information regarding her condition.

Q: Pregnant by who?

A: Her live-in boyfriend, José Aguilera.

\* \* \*

Q: Do you work with the police department at all? Do you work for them?

A: Not at all.

Q: Okay. So what do you tell her that your job is?

A: When [we] went in there, I introduced myself, to remind her who I was and that I was with Child Protective Services and that we wanted to get some information concerning her condition: her pregnancy.

\* \* \*

Q: So what did [appellant] tell you?

A: [Appellant] began telling me about the day of the incident .... *She also admitted that she did what she did, because she did not love her son and that she only loved her five year old daughter.*

She told me that the reason why she had fought CPS back then, when we first became acquainted, was because she was fighting for her five year old little girl. She had done it all for her little girl. Her name's Yesenia, also. And that she never wanted to get [her son] back, because she didn't love him.

Q: Did she ever say, "José did this. I didn't do it"?

A: She did not. *She admitted to having done everything. I was stunned. I was very surprised.* (Emphasis added)

During her cross-examination, Calvo agreed with appellant's attorney that appellant did not "specifically say" that she caused her son's death and that she did not say that she "intentionally" burned him; however, appellant did not use the word "accident" in connection with the burns.

3. Officer James McLellan of the Irving Police Department testified that the dispatcher sent him to an apartment on August 30, 2001, in response to a "911 hang up call"; the officer arrived at 4:35 p.m., went upstairs, and knocked on the door. The door was unlocked, and the officer realized that it was "possibly an emergency situation." Officer McLellan opened the door, announced himself, and went into the apartment. A Hispanic male came from a back bedroom and "motioned" the officer to come there; the man did not speak English; and the officer could see that the baby's breathing was labored and raspy. The paramedics were already on their way, and they arrived soon after the police officer. Officer McLellan stayed there while the paramedics treated the child, and he saw that the baby had a "burn mark" and that there were scratches and bruises "all over the body."

4. Jack G. Taylor, a firefighter/paramedic for the City of Irving, testified that he arrived a "few seconds" after the police officer. Taylor saw the baby on the bed, and he knew immediately that the baby was having trouble breathing. Taylor described the baby's condition: the legs were thin; the knees were swollen; there were bruises on the legs; the right calf was swollen; there were several abrasions on the head; there were indications of a skull fracture; there were scratches and abrasions on the face; and there was a missing portion or bad gash of the left upper lip. Two more paramedics arrived, and they documented the findings. Taylor also described a bad burn scar on the baby's side and said that the left upper arm was swollen to twice the size it should have been, that there were obvious fractures in that arm, and that the arm was obviously dislocated. There was also a burn on the baby's right hand. They took the baby to the hospital. Taylor said that this was the most severe case of child abuse that he had seen.

5. Julia McDonald, M.D., a pediatric physician in the emergency room at Children's Medical Center, was working on the afternoon of August 30 when appellant's son was brought to the hospital. Dr. McDonald authenticated the medical records and photographs of the child, and they were admitted into evidence. Dr. McDonald discussed the injuries which she found; they included second and third degree burns, scratches, bruises, bite marks, and broken bones. Dr. McDonald also said that the "CT showed a subdural hematoma" which could have been caused by shaking the baby. Dr. McDonald testified that she had never seen "a case this bad, of child abuse." During cross-examination, Dr. McDonald agreed that "some of these injuries" could have been caused by accident, but not all of them. During her redirect examination, Dr. McDonald testi-

fied that she found "fractures of different ages" and "wounds healing of different ages."

6. Barry Hicks, M.D., a pediatric surgeon and director of the trauma center at Children's Medical Center, was also involved in the treatment of appellant's son. Dr. Hicks said that the boy had "multiple injuries," broken bones of different ages, burns of different ages, and bruises of different ages. Dr. Hicks said that the boy had a severe head injury and that he was unconscious for several days before he died. Dr. Hicks testified that it was the "worst" battered child case that he had ever seen. During his cross-examination, Dr. Hicks agreed that the head injury was the cause of the child's death.

7. Consuelo Villalobos testified through an interpreter that appellant came from Houston to live with her husband's nephew. They were not married. Villalobos testified that appellant came to her house on the night that appellant's son was taken to the hospital and that appellant did not tell her anything except that "the boy was taken by the ambulance." Villalobos testified that the police came to her house; that she remembered them talking to appellant; and that the police treated appellant with respect. Villalobos testified that appellant was cooperative and that she went with the police voluntarily.

8. Dr. Robert Glenn Williams testified that he is a forensic dentist for the Southwestern Institute of Forensic Sciences, that he took impressions from appellant's mouth to see if her teeth generated the bite marks which were found on her son's body, and that there was a match between appellant's teeth and the bite marks which were found.

9. Pattie Booth, an investigator for CPS, testified that she went to the hospital to see appellant's son and that she arrived a few minutes after the ambulance. Two other investigators went to the police station. Booth took pictures while the doctors and nurses were working. Booth said that the boy's injuries were "catastrophic," that he was "never conscious," and that there was a "huge team of medical staff ... fighting for this little guy." Booth took photographs to the police station for the other investigators to use while they were interviewing appellant and the "stepfather." Booth took appellant's daughter so that CPS could arrange placement for her.

10. Officer Steven Hazard of the Irving Police Department testified that he was assigned to the Crime Scene Search Unit and that he took pictures of the apartment where appellant lived with her boyfriend and her two children. He described the pictures, and they were admitted into evidence. Some of the pictures showed bloodstains and traces of blood.

11. Detective Jack Jeffrey of the Irving Police Department testified that he was assigned to the Domestic Violence Unit, that he was at home on August 30 when he was called back to the police station, that he was told that they had an "injury to a child" case, and that the man who had called the police was at the police station. After he talked to that man, Detective Jeffrey located appellant and talked to her through an interpreter. When he had the interpreter ask appellant about the last time that her child had seen the doctor, appellant said something like: "[W]e have neglected the child." Detective Jeffrey said that, at that point, he realized that appellant was a suspect, and he had the interpreter read the *Miranda* warnings[3] to her in Spanish. Detective Jeffrey said that appellant indicated that

3. See *Miranda v. Arizona*, 384 U.S. 436, 86     S.Ct. 1602, 16 L.Ed.2d 694 (1966).

she understood those warnings and that she signed the *Miranda* card which had been read to her. Detective Jeffrey decided that he needed the assistance of a Spanish-speaking officer, and he stopped the interview and had appellant arrested.

On the afternoon of August 31, Detective Jeffrey and Officer Ray Delacruz started their interview of appellant at about 5:00 p.m. Officer Delacruz read her the *Miranda* warnings in Spanish, and he had her sign another *Miranda* card. The officers would show appellant pictures of the baby and ask her to describe how the injuries happened. Appellant would tell Officer Delacruz in Spanish, and he would dictate the translation in English. After the clerk-typist typed the statement, a civilian witness was present when the statement was read back to appellant. The witness was told in Spanish what the statement said in English. The statement showed 12 different places where the witness added something that she wanted or scratched out something that she did not want. Each of those revisions was initialed by appellant when she signed the statement.

On September 5 and again on September 7, Detective Jeffrey and Officer Delacruz went back to the jail for the second and third statements which were signed by appellant. Those two statements were very short, and appellant wrote each of them herself. During his cross-examination, Detective Jeffrey agreed that he did not speak Spanish, that he did not know exactly what appellant was trying to tell Officer Delacruz, and that the interview was neither videotaped nor audiotaped.

12. Naomi Pastrano, a program director for CPS, testified that she was called into this case to assist in translating. She went with the Irving police officer to try to find the five-year-old child. Pastrano asked appellant if she would go to the police station with them, and appellant was cooperative. Pastrano said that she read the *Miranda* card warnings to appellant, that appellant appeared to understand what was going on, and that appellant signed the warning card.

13. Officer Ray Delacruz of the Irving Police Department testified that Spanish was his first language and that he was bilingual in Spanish and English. Detective Jeffrey brought Officer Delacruz into the case to assist in the interview with appellant on August 31. Appellant had already been arrested, and the interview was done in Detective Jeffrey's office. Officer Delacruz testified that he read the *Miranda* rights to appellant in Spanish at the very beginning of the interview. Officer Delacruz asked appellant if she wanted to write the statement or if she wanted him to dictate the statement and have it typed. She preferred to have the statement dictated and typed. Appellant would answer Officer Delacruz's questions in Spanish, and then he would dictate the statement in English. After the statement was typed in English, a civilian witness who spoke English and Spanish observed and made sure that the statement was correctly translated when it was read back to appellant in Spanish. Appellant made several changes to her statement. She initialed each insertion and each deletion, and then she signed the statement. After the statement was admitted into evidence, Officer Delacruz read it to the jury. Relevant portions of the statement read as shown:

I, Yesenia Cruz Hernandez, am 20 years old and live at the apartments on Shoaf St. in Irving, TX. I'm making this statement to law enforcement officer Ray De La Cruz.

I live with José Guadalupe Aguilera. I am six months pregnant with his child. I also have a five-year daughter name

Yesenia from a prior marriage and a one year old baby boy named Roy Aguilera .... *After my son was returned to me, I never loved him the same after that. I didn't love him after they returned him. I was okay with him for a few months, and then I did those things to him....Then after I got pregnant, I started to treat him bad. Investigator De La Cruz showed me pictures of the injuries, and I told him how I did the injuries.* He showed me a picture of a fingernail, and I caused the injury on the fingernail by biting him. That's been about a month ago, but then he re-injured it. He showed me a picture of the burn mark on his back, and I did that last Monday with a hot iron. He has an injury on his right arm....That was caused by teeth marks where I bit him two times. The burn on his hand, I did that about a day before I burned him with the iron. I put a hot pan on the table and he touched it, but I let him touch it. He also showed me some injuries on the left side of his neck, and I did those with my hands. Those are scratches. What he has on his ears are where I squeeze them with my fingers. The scratches on his head, I did those with my hands by pulling his hair. The injuries that he has on his forehead is where I hit him with a broomstick a week ago. The injury on his left arm, the one that was swollen, I caused it about two months ago. He was about to fall from the bed and to keep him from falling I grabbed him by the arm and yanked him up and I heard his arm pop. After that, he wouldn't lift up his arm. (Emphasis added)

Officer Delacruz also testified about the two short statements which were written by appellant in Spanish in her own handwriting. Appellant said in her statement on September 5:

[W]hen I hit the boy on the forehead with the broom handle, I just hit him once but I hit him hard last Tuesday was when I hit him a week ago I hit him.

Appellant said in her statement on September 7:

[O]n Wednesday I pulled his hair hard from side to side and I moved his head from side to side where I was pulling his hair after a little bit he began to not have enough air and to have an attack and on the following day the ambulance took him away. I pulled his hair in the same place where I hit him with the toy a month before.

During his cross-examination, Officer Delacruz agreed that he was not certified as a translator, and he also agreed that the statement could have been taken in Spanish and then translated into English by a certified translator. Officer Delacruz agreed that the statement could have been audiotaped or videotaped, and he said that he knew that appellant had only a third grade education.

14. Alma Cariado testified that she was a dispatcher for the Irving Police Department and that she spoke Spanish. She witnessed the statement which appellant gave to Officer Delacruz. Cariado heard him ask appellant if it was her statement and if she gave it freely and voluntarily, and she heard appellant answer: "Yes." Cariado testified that she stood next to Officer Delacruz while he read the statement, that he translated it from English into Spanish as he read it to appellant, and that he translated it correctly. Cariado testified that appellant appeared to understand what was going on. During her cross-examination, Cariado agreed that appellant was in handcuffs and that she was not free to leave the room.

15. Dr. David Dolinak testified that he was the medical examiner who performed the autopsy on appellant's son. Dr. Doli-

nak authenticated the 14–page autopsy report, and it was introduced into evidence. Dr. Dolinak said that the autopsy was "spread over two days" because there were "so many injuries to document." Dr. Dolinak was recalled on the last day of trial, and he discussed the autopsy photographs which were admitted into evidence over appellant's objection.[4] The photographs will be further discussed in connection with Point of Error No. 7.

16. George Cowart testified that he was a member of the grand jury which returned the indictment in this case; that the grand jury was not able to "determine exactly what object struck the child that caused these injuries"; and that, according to the testimony given to the grand jury, there was not any additional investigation which could have been done to determine "the exact nature and description of the weapon" that caused the death of appellant's son.

### The Written Statements

■ Appellant argues in her first two points of error that the trial court erred in admitting her written statements into evidence. Appellant argues that those statements were not "freely and voluntarily made without compulsion or persuasion." See TEX. CODE CRIM. PRO. ANN. art. 38.21 (Vernon 1979). Appellant also argues that the admission into evidence of these statements was a violation of her rights under U.S. CONST. amends. V and XIV; a violation of her rights under TEX. CONST. art. I, § 19; and a violation of her rights under TEX. CODE CRIM. PRO. ANN. art. 38.23 (Vernon Pamph. Supp. 2003).

The record supports the trial court's finding that appellant's statements were freely and voluntarily made without com-

pulsion or persuasion. See *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Cr.App. 1997), which makes it clear that an appellate court should give "almost total deference to a trial court's determination of the historical facts" which the record supports when they are based upon an evaluation of credibility and demeanor. Both the documentary evidence and the testimony support the trial court's finding that appellant voluntarily made, signed, and verified all three written statements and that there was no compulsion or persuasion. The trial court determined these issues by looking at the totality of the circumstances. See, e.g., *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The fact that there was a delay in taking appellant before a magistrate, without the "showing of a causal connection" between the delay and the confession, does not affect the validity of appellant's confessions. See, e.g., *Boyd v. State*, 811 S.W.2d 105, 124 (Tex.Cr. App.), *cert. den'd*, 502 U.S. 971, 112 S.Ct. 448, 116 L.Ed.2d 466 (1991). Points of Error Nos. 1 and 2 are overruled.

### The Oral Statements

Appellant argues in her next two points of error that the trial court erred in overruling her objection to testimony by Calvo (the CPS employee). Appellant cites *Cates v. State*, 776 S.W.2d 170, 173 (Tex. Cr.App.1989), in support of her contention that this CPS employee was "operating as an agent of law enforcement." *Cates* is factually distinguishable because: (1) that investigator was not conducting a routine interview to assist in solving a problem within the family unit; and (2) those statements were made in direct response to questions from the investigator. See *Cates v. State*, supra at 174.

---

4. There were 65 autopsy photographs, and 39      of them were admitted into evidence.

■ The investigator in the case before us was not operating as an agent of law enforcement, and the oral statements by appellant were not made in response to questions. See *Cantu v. State*, 817 S.W.2d 74, 75 (Tex.Cr.App.1991), where the court discussed the facts which distinguish *Cates* from the case which is now before us. The court also made it clear in *Cantu v. State*, supra at 77:

At a suppression hearing the trial judge is the sole judge of the credibility of the witnesses and of the weight to be given the testimony. The judge may believe or disbelieve any or all of any witness' testimony. Those findings should not be disturbed absent a clear abuse of discretion. (Citations omitted)

See also *Paez v. State*, 681 S.W.2d 34 (Tex.Cr.App.1984), where the facts were similar to the facts in the case which is now before us.

The trial court did not abuse its discretion in overruling appellant's motion to suppress her oral statements to the CPS employee and in overruling her objections to this testimony. Appellant's spontaneous, unsolicited oral statements were not in response to interrogation. See *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Moreover, appellant did not have the Sixth Amendment right to counsel during an interview on a civil matter because that right is "offense specific." See *McNeil v. Wisconsin*, 501 U.S. 171, 174, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). Points of Error Nos. 3 and 4 are overruled.

### Sufficiency of the Evidence

■ The evidence which is summarized above is both "legally" and "factually" sufficient to support appellant's conviction for the capital murder of her son. We have reviewed all of the evidence, and we have determined that a "rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Vasquez v. State*, 67 S.W.3d 229, 236 (Tex.Cr.App. 2002). Point of Error No. 5 is overruled.

This court has also determined that the conviction is neither so "obviously weak" nor so "greatly outweighed" by contrary evidence that the conviction is "clearly wrong and manifestly unjust." *Vasquez v. State*, supra. Point of Error No. 6 is overruled.

### The "Gruesome" Photographs

Appellant argues in Point of Error No. 7 that the trial court erred "in permitting gruesome photographs to be introduced into evidence." Appellant's argument under this point refers to several autopsy photographs which Dr. Dolinak said would help him describe the injuries. When the State offered the autopsy photographs, appellant objected, and the trial court had a hearing outside the presence of the jury. After an overnight recess, several of the autopsy photographs[5] were admitted into evidence and described by Dr. Dolinak. Appellant complains in her brief about photographs of the child's arm and arm bones (State's Exhibit Nos. 121, 123, 124, 125, 126, and 127) and about photographs of the child's skull and brain (State's Exhibit Nos. 140, 141, and 142).

■ See *Harris v. State*, 661 S.W.2d 106, 107 (Tex.Cr.App.1983), another case involving autopsy photographs of a child who had died from abuse, where the court quoted the rule which was adopted in *Mar-*

5. See Footnote No. 4 which notes that 26 of the autopsy photographs were not admitted into evidence.

*tin v. State,* 475 S.W.2d 265 (Tex.Cr.App. 1972):

> [I]f a photograph is competent, material and relevant to the issue on trial, *it is not rendered inadmissible merely because it is gruesome* or might tend to arouse the passions of the jury, unless it is offered solely to inflame the minds of the jury. If a verbal description of the body and scene would be admissible, a photograph depicting the same is admissible. (Emphasis added)

The determination of admissibility of photographic evidence is "left to the trial court's discretion." *Harris v. State,* supra; *Martin v. State,* supra. Consequently, a trial court does not abuse its discretion if the photographs:

> [W]ill help the jury to understand verbal testimony, such as the technical language used by a medical doctor in describing the injuries sustained by a victim of a crime.

■ The trial court did not abuse its discretion in permitting the autopsy photographs to be admitted into evidence. They helped the doctor explain his findings. Even though the injuries to the arm were not the probable cause of the child's death, the photographs of the arm were relevant under TEX.R.EVID. 401 on the issue of appellant's intentional child abuse which ultimately led to the death of her child. Appellant's intent can be "inferred from [her] conduct." *Patrick v. State,* 906 S.W.2d 481, 487 (Tex.Cr.App.1995). The autopsy findings did not refer to "extraneous" injuries; the child's massive injuries were interconnected and overlapping injuries. Point of Error No. 7 is overruled.

### Notice of "Extraneous" Offenses

Appellant argues in Point of Error No. 8 that she was not given "proper notice of extraneous offenses." The clerk's record shows that a "Notice of Extraneous Offenses" was filed on August 13, 2002, and the reporter's record shows that a copy of that notice was "faxed" to appellant's attorney on that same date.[6] The State gave notice, that during its case-in-chief or during punishment, the following "crimes, wrongs or acts" may be introduced:

> The defendant, Yesenia Hernandez, engaged in a continuing course of criminal conduct with the Complainant, Roy Aguilera, a child, in Dallas County, Texas between the dates of February 2000 until August 2001. The conduct consisted of the following:
>
> ● Striking and scratching the complainant's torso, extremities, face, head, with the defendant's hand
>
> ● Pulling and twisting the complainant's arms and legs causing fractures and severe bruises
>
> ● Burning the complainant's neck, back, chest, shoulders, feet, hands, and arms with a clothes iron
>
> ● Striking the complainant with and against a broom stick, toys, wall, floor, any unknown object causing severe head injury
>
> ● Shaking the complainant with defendant's hands causing fractured ribs and head trauma
>
> ● Malnourishment of the complainant by failing to feed the complainant and seek proper medical attention and the defendant had a legal duty to do so
>
> ● Choking the complainant's neck with her hands
>
> ● Biting the complainant's buttocks, arms, fingernails with the defendant's teeth

The notice which the State gave to appellant's attorney was "reasonable notice"

---

**6.** The voir dire of the jury panel began seven days later.

in advance of trial under TEX.R.EVID. 404(b). See also TEX. CODE CRIM. PRO. ANN. art. 37.07, § 3(g) and art. 38.37 (Vernon Supp.2003 & Pamph. Supp. 2003). Point of Error No. 8 is overruled.

*This Court's Ruling*

The judgment of the trial court is affirmed.