MEMORANDUM OPINION




No. 04-06-00082-CR



Kimberly Michele ALEXANDER,


Appellant



v.



The STATE of Texas,


Appellee



From the 144th Judicial District Court, Bexar County, Texas


Trial Court No. 2004-CR-5961


Honorable Mark R. Luitjen, Judge Presiding



Opinion by: Phylis J. Speedlin, Justice


Sitting: Alma L. López, Chief Justice

 Phylis J. Speedlin, Justice

 Rebecca Simmons, Justice


Delivered and Filed: May 2, 2007


AFFIRMED

 Kimberly Michele Alexander appeals her conviction for the capital murder of her daughter
Diamond Alexander-Washington. We affirm the trial court's judgment.

Background

 When Diamond Alexander was born, she was placed into the custody of Child Protective
Services (CPS), and later with a foster family, where she remained until she was two years old. On
March 31, 2004, Diamond was placed back with her biological mother, Kimberly Alexander. On
June 5, 2004, at approximately 4:00 p.m., police and EMS received a call that a child was in cardiac
arrest. When EMS arrived at the apartment, they found two-year old Diamond lying on the living
room floor, unresponsive. Diamond had no pulse or respiration, and her EKG was a "flat line." Her
mother, Kimberly Alexander, was present along with a friend, Elizabeth Youngblood, who was also
living in the apartment. When questioned at the scene about Diamond's medical history and what
happened to her, Alexander made no response and her demeanor was detached and unemotional; 
Alexander later told police that Diamond had fallen off her training potty. Diamond was airlifted
to a hospital where she was diagnosed as being in complete cardiopulmonary arrest; she was
removed from life support and pronounced dead the next day. Diamond's body exhibited extensive
bruising on her forehead, chest, back, both arms and both legs, along with hemorrhaging around her
optic nerves, and a closed head injury, with swelling and bleeding in the brain. Her liver also had
a significant laceration, which was a potentially fatal injury. The medical examiner who performed
the autopsy concluded that all the injuries were the result of blunt force trauma occurring within the
same time period, and that at least three different instruments were used to inflict a minimum of 26
blows. Diamond's cause of death was determined to be blunt trauma to the head and thorax. 
Alexander was indicted for capital murder. After a jury trial, Alexander was convicted of capital
murder, and sentenced to life in prison. This appeal followed.

Analysis

 Sufficiency of the Evidence

 In her first issue, Alexander argues the evidence is legally and factually (1) insufficient to
support the jury's finding that she intentionally or knowingly caused Diamond's death; she asserts
she merely intended to discipline her child, and there is nothing in the record to suggest she intended
to cause her death. In determining legal sufficiency, we review all the evidence in the light most
favorable to the verdict to determine whether any rational trier of fact could have found the essential
elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979);
Vodochodsky v. State, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). The jury, as trier of fact, is the
sole judge of the credibility of the witnesses and the weight to be given their testimony; therefore,
reconciliation of any conflicts in the evidence is within the exclusive province of the jury. Mosley
v. State, 983 S.W.2d 249, 254 (Tex. Crim. App. 1998). The jury is also permitted to make
reasonable inferences from the evidence. Id. at 254-55.

 In determining factual sufficiency, we view all the evidence in a neutral light, both for and
against the jury's verdict, and only set aside the verdict if "proof of guilt is so obviously weak as to
undermine confidence in the jury's determination, or the proof of guilt, although adequate if taken
alone, is greatly outweighed by contrary proof." Vodochodsky, 158 S.W.3d at 510; Watson v. State,
204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006); Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim.
App. 1997) (court views "all the evidence without the prism of 'in the light most favorable to the
prosecution' and sets aside the verdict only if it is so contrary to the overwhelming weight of the
evidence as to be clearly wrong and unjust"). The factual sufficiency analysis consists of two
prongs: (1) "whether the evidence introduced to support the verdict, though legally sufficient, is
nevertheless 'so weak' that the jury's verdict seems 'clearly wrong and manifestly unjust;'" and (2)
"whether, considering conflicting evidence, the jury's verdict, though legally sufficient, is
nevertheless against the great weight and preponderance of the evidence." Watson, 204 S.W.3d at 
414-15. The appellate court is authorized to disagree with the jury's determination, even if probative
evidence exists which supports the verdict, but must avoid substituting its judgment for that of the
fact-finder. Id. at 415, 417; Johnson v. State, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000) (factual
sufficiency review requires appellate court to afford "due deference" to jury's determinations).

 The indictment charged Alexander with capital murder by alleging she "intentionally and
knowingly caus[ed] the death of Diamond ... by striking [her] with a plastic tube, by striking [her]
with the hand of the defendant, by striking [her] with an object or objects unknown to the grand jury,
and by striking [her] against an object or objects unknown to the grand jury, and Diamond ... was
a child under six years of age." See Tex. Penal Code Ann. §§ 19.03(a)(8), 19.02(b)(1) (Vernon
Supp. 2006 & 2003) (providing a person commits the offense of capital murder if she "intentionally
or knowingly causes the death of an individual," and the individual is under six years of age). The
jury charge instructed the jury to convict Alexander if they found beyond a reasonable doubt that she
intentionally or knowingly caused Diamond's death by one of the alleged means listed in the
disjunctive. The jury was further instructed that a person acts "intentionally" with respect to a result
of her conduct when it is her conscious objective or desire to cause the result; a person acts
"knowingly" with respect to a result of her conduct when she is aware that her conduct is reasonably
certain to cause the result. See Tex. Penal Code Ann. § 6.03(a), (b) (Vernon 2003).

 The State asserts that under the jury charge, proof that Alexander either intentionally or
knowingly caused Diamond's death through any of the alleged means is sufficient, and the jury need
not have unanimously agreed on the particular means of commission. We agree. It is well settled
that even though an indictment may allege different methods of committing the offense in the
conjunctive, it is appropriate for the jury to be charged in the disjunctive and to return a general
verdict if the evidence is sufficient to support a finding under any of the alternative theories. See
Kitchens v. State, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991); Cameron v. State, 988 S.W.2d 835,
849-50 (Tex. App.--San Antonio 1999, pet. ref'd). Therefore, we must examine the trial evidence
to determine whether it is legally and factually sufficient to support the jury's finding that Alexander
intentionally or knowingly caused Diamond's death by one of the alternative means. 

 At trial, Elizabeth Youngblood, who was living in Alexander's apartment, testified that she
witnessed almost the entire incident between Alexander and Diamond. At about noon on June 5,
2004, Alexander pulled Diamond by the arm from her bedroom into the living room, saying, "this
pissy bitch, she pissed again." Alexander made Diamond stand up in front of her while she sat on
the couch and "hit her on the bottom quite a few times" with a remote control; Diamond was then
made to remain standing there for approximately 30 minutes. Youngblood stated it was not unusual
for Diamond to be punished for wetting herself by being made to stand in one place and not move. 
After 30 minutes, Alexander exclaimed, "Look, look at this bitch. She stood right here and peed on
my rug." Alexander then punched Diamond in the chest with a closed fist, knocking her to the floor;
Alexander told Diamond to "get up and come here," which she slowly did; Alexander told her she
knew better and punched her in the chest a second time, again knocking her down; Alexander called
Diamond over again, and told her in a raised voice, "you're going to quit pissing...," and punched
her a third time, harder, causing Diamond to fly backward and land on her back. Again, Alexander
called Diamond back over to the couch. Youngblood stated the first punch was hard, but the third
punch was even harder and Diamond was slower to get up and creep back to Alexander. 
Youngblood asked Alexander, "what are you doing?" but Alexander told her to mind her own
business.

 After Diamond had stood up in front of the couch for about 15 more minutes, Alexander
asked Youngblood to bring her the "black hose" from the hall closet. Youngblood brought a hard
plastic vacuum cleaner attachment to Alexander, who tapped it on the ground and pointed it at
Diamond, saying, "pissy bitch, you're going to quit pissing in my house. I'm tired of you. I frankly
wouldn't give a f*** if you went back." Alexander put the attachment down for a while, but after
about 15 more minutes she picked it back up and started pounding it on Diamond's feet, repeatedly
calling her a "pissy bitch," and saying she was tired of her "pissing in my house." Diamond stayed
in place, "whining," as Alexander began hitting her on her legs and then on her back, side and chest. 
Youngblood stated she knew that it hurt Diamond, and told Alexander, "that's enough. What are you
doing?!" But Alexander continued, and started hitting Diamond on her head - the first hits were
"hard, too hard to hit a two year old," and the more Alexander hit her, the harder she hit while
angrily saying, "quit pissing in my house, pissy bitch. I can't stand you. I wish you would go back." 
Finally, Alexander hit Diamond on the side of her head, and then the last and hardest hit was to the
top of Diamond's head "like a hammer on a nail." Diamond fell down to the floor and did not get
up. This time, Alexander did not tell Diamond to get up, or say anything to her. Youngblood went
over to check on Diamond, who was not moving at all, while Alexander remained sitting on the
couch, telling her, "Girl, you know she's just having a fallout fit." (2)

 At that time, which was approximately 3:00 or 3:30 p.m., Youngblood left the apartment to
call a friend to pick her up because she "wanted to get out of there;" she was unable to reach the
friend, and returned to Alexander's apartment about ten minutes later. When she entered, she saw
Alexander walk in from another room carrying Diamond by one arm "like a chicken;" she set her
down on the living room floor. Diamond was not moving, and was laying with her legs bent and
head turned. Youngblood stated she did not look the same as she had ten minutes before, and looked
"worse." Youngblood asked Alexander what was wrong with her, and Alexander again replied she
was just having a "fallout fit" and sat on the couch. Youngblood went over and found that Diamond
was not breathing; she began performing CPR and "kept trying to get Alexander to call 911." 
Alexander was just watching. Finally, Alexander instructed Youngblood to tell a story about how
Diamond had fallen off the potty and hit herself on the bathroom floor; she got Youngblood to agree
to the story before calling 911. After the call, Alexander made one attempt at CPR, but Youngblood
performed most of the CPR until the paramedics arrived. Youngblood initially told police the agreed
upon story about Diamond falling off the toilet because she was scared, but decided to tell the truth
the next day before she found out that Diamond had died, "to get that little girl some justice."

 The medical evidence showed that, among many other injuries, Diamond had two potentially
fatal injuries caused by blunt force trauma - a significant laceration to her liver and a closed head
injury that caused swelling and bleeding in her brain. Dr. Richard Taylor, the pediatric critical care
specialist who treated Diamond, testified that upon her arrival at the hospital she was in "complete
cardiopulmonary arrest" and had no brain function; she was placed on a mechanical ventilator and
given drugs through a continuous IV infusion to stimulate her heart. Dr. Taylor observed very large
bruises on both of Diamond's arms extending from her shoulders to her elbows, bruising on her legs
extending from the knees to the ankles, a prominent bruise on her forehead, redness and bruising on
her chest - only some of which could have been caused by CPR, abrasions on her pubic area, and
a bruise on her eyelid with retinal bleeding. A CAT scan revealed brain swelling and a life-threatening liver injury that potentially could have regenerated if she had survived. He stated that
a major laceration to the liver takes a "goodly amount of force to cause it," and that bleeding in the
back of the eye was evidence of "a lot of force" which probably would have caused Diamond to have
blindness or at least impaired vision. Dr. Taylor concluded that all the injuries were non-accidental
injuries caused by major trauma equivalent to that of a high speed car accident, and were "highly
suspicious of an inflicted injury;" Diamond's injuries could not have been caused by falling off of
a training potty or an adult size toilet.

 Dr. Kimberly Molina, the medical examiner who performed the autopsy, testified that, apart
from the injuries, Diamond was a normal, well developed and well nourished child. Externally, there
was swelling and bruising across Diamond's entire forehead, bruising and abrasions lateral to both
eyes, a laceration to her inside upper lip, linear diagonal bruising on her back, a large bruise in the
center of her chest, linear abrasions above her pelvic bone, plus multiple bruises and abrasions on
both arms, both legs and both feet. Her legs showed multiple thin, linear bruises on the upper thighs
consistent with a "whipping injury" caused by a cord or open coat hanger, and circular deep bruises
on the lower legs and feet caused by a cylinder consistent with the vacuum cleaner attachment
recovered from the apartment. Internally, there was hemorrhaging beneath the scalp on the back of
her head and across the whole top of her head and forehead, diffused hemorrhaging below the skin
of her buttock meaning "the entire buttock was basically one large bruise," a subdural hematoma
under the skull with brain swelling, and a hematoma inside the liver. With the exception of the
bruising on the back of her head which showed some healing, all of Diamond's injuries were
inflicted by blunt force trauma within six hours prior to her hospitalization. The major injuries to
her head and liver were consistent with being struck by the hard plastic vacuum cleaner attachment;
the liver injury was also consistent with stomping on or punching the upper abdomen; her brain
injury was consistent with causing cardiac arrest. Diamond's cause of death was blunt force trauma
to the head and thorax, or chest, both of which are very vulnerable areas. Like Dr. Taylor, Dr.
Molina opined that these injuries were caused by a "significant amount of force" like that caused by
a high speed car accident. Dr. Molina testified that, at a minimum, 26 blows were struck, and that
three different instruments were used based on the various linear, circular and diffused bruising
patterns. Finally, Dr. Molina stated Diamond's injuries could not have been caused by falling off
a training or adult toilet onto a hard floor; rather, they were consistent with "basically being beaten
to death."

 In addition to the eyewitness testimony and medical evidence, there was testimony about the
relationship between Diamond and Alexander in the months preceding her death. Diamond's foster
parent, Kevin Godley, testified she lived with his family for approximately nine months during
which she was very talkative and active, a typical child. During supervised visits between Diamond
and Alexander, he observed their relationship to be "cordial," an "acquaintance-type" relationship
with little physical affection or bonding between them. Diamond's CASA (3) volunteer, Dale
Anderson, who first became involved when she was one month old, testified that during supervised
visits, he observed a "fringe" relationship between Diamond and Alexander, with very little physical
contact except for feeding; Alexander did not play with or encourage Diamond, but there did not
appear to be any animosity. When Diamond was living with her foster parents, she was "outgoing,
vivacious, a very happy, fun-loving, energetic little girl," and "you could see the love flowing
between them, both ways." After Diamond was permanently reunified with Alexander on April 1,
2004, Anderson observed that their relationship remained the same, with very little physical contact
or playing, and Diamond had become "withdrawn." Both Godley and Anderson testified that, after
the reunification, they lost contact with Diamond and Alexander because Alexander had moved and 
could not be located for six weeks. Anderson last visited Alexander's home on May 25, at which
time Diamond looked okay, but Alexander appeared "very frustrated" with her situation; in
Anderson's opinion, the transition was "not going well." Both Godley and Anderson spent hours
at the hospital with Diamond on June 4 and 5, but did not see Alexander at the hospital.

 Youngblood testified that during the two weeks she lived in Alexander's apartment, she saw
that Alexander did not play with Diamond or show her affection, as she did with her infant son; in
fact, Alexander would repeatedly say that she "can't stand that little bitch," and she would not care
if she "went back." In contrast, Diamond's father, Tarri Washington, Sr., played with and talked to
her more, and did most of her feedings. Diamond was being potty trained, and Alexander would
often punish her for wetting herself by keeping her in the soiled clothes, or making her sleep on
soiled sheets, and having her stand in one place while Alexander played with the baby; however, she
would not punish Diamond in front of her father. Diamond acted "scared" of Alexander, and when
called she would "creep over, real slow." Youngblood described Diamond as "very shy, very scared,
not playful at all," and stated she rarely spoke and just kept to herself.

 Finally, Youngblood and various police officers, CPS and EMS personnel testified to
Alexander's demeanor immediately after the incident on June 4. Youngblood stated that when she
was trying to revive Diamond, Alexander was "just standing there and looking at her," with no facial
expression. When the paramedics were working on Diamond, Alexander just stood in one spot,
looking on; she never yelled, screamed or cried. In contrast, when Diamond's father arrived just
before they loaded her into the Air Life helicopter, he was upset and angry, asking, "Oh my God,
what ... happened... my daughter, my daughter." One of the paramedics similarly testified that the
father's reaction was very emotional, hysterical, "what you would expect," while Alexander's
reaction was the opposite. The officers who testified stated that Alexander had a "neutral
demeanor," "sort of like a passerby;" she was just standing there observing, was not crying and did
not seem concerned about the child. In contrast, Youngblood, who was caring for the infant boy,
was more emotional and concerned, and trying to be helpful. When the father arrived, he was "very
concerned and upset." When Alexander returned to her apartment after being questioned at the
police station, she did not ask to be taken to the hospital to see Diamond, but was more concerned
about whether anyone had stolen her TV. Finally, the CPS caseworker who came to the apartment
the next day to interview Alexander and remove the infant boy testified that, during the interview,
she received a call from the hospital stating Diamond was deteriorating and about to be removed
from life support. Both Diamond's father and Youngblood began to cry, while Alexander just
looked down at the floor. When she offered to take them immediately to the hospital, Alexander
declined and indicated she would find a ride.

 Alexander's intent may be inferred from her actions and statements during and after the
incident, as well as from the extent of Diamond's injuries, the relative size and strength between
Alexander and Diamond, and their relationship. See Tex. Code Crim. Proc. Ann. art. 38.36(a)
(Vernon 2005); see also Patrick v. State, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995); Duren v.
State, 87 S.W.3d 719, 724 (Tex. App.--Texarkana 2002, pet. stricken) (fact finder may use common
sense and apply common knowledge, observation, and experience when giving effect to reasonable
inferences from the evidence and may infer defendant's knowledge or intent from acts, words and
conduct). There was undisputed evidence that the relationship between Diamond and Alexander was
neutral, at best, and Alexander showed no remorse or concern for Diamond after she became
unresponsive and was taken to the hospital. Even when told Diamond was about to die, Alexander
had no reaction; in comparison, Diamond's father and Youngblood were emotional and upset. 
Further, the evidence showed that Alexander lied about what happened. Alexander's explanation
that Diamond fell off the toilet was inconsistent with the medical evidence; both medical experts
stated it was "not possible" for Diamond to sustain such significant injuries in such a fall. On the
other hand, the medical evidence corroborated Youngblood's trial testimony about the types of
injuries inflicted, the instruments used, and the time frame during which they were inflicted. The
degree of force used, equivalent to a high speed car accident, and the fact that vulnerable areas like
the head and abdomen were targeted, are also supportive of an inference that Alexander intentionally
or knowingly killed Diamond, and was not merely intending to discipline her. (4) We conclude that
the evidence is legally and factually sufficient to support the jury's finding that Alexander
intentionally or knowingly caused Diamond's death by striking her with her hand, a plastic tube or
unknown object, or against an unknown object. See Duren, 87 S.W.3d at 724-27; see also
Montgomery v. State, 198 S.W.3d 67, 87-88 (Tex. App.--Forth Worth 2006, pet. ref'd); Hernandez
v. State, 118 S.W.3d 469, 472-77 (Tex. App.--Eastland 2003, pet. ref'd). Alexander's first issue
is overruled. 

 Change of Venue

 In her second issue, Alexander contends the trial court erred in denying her motion for a
change of venue under article 31.03 of the Texas Code of Criminal Procedure. Tex. Code Crim.
Proc. Ann. art. 31.03 (Vernon 2006). We review the court's refusal to grant a change of venue for
an abuse of discretion, and will not disturb the court's ruling as long as it falls within the zone of
reasonable disagreement. Renteria v. State, 206 S.W.3d 689, 709 (Tex. Crim. App. 2006).

 Article 31.03(a) provides that a change of venue may be granted on the defendant's written
motion, accompanied by affidavits, for either of the following causes: "(1) [t]hat there exists in the
county where the prosecution is commenced so great a prejudice against [the defendant] that [s]he
cannot obtain a fair and impartial trial; and (2) [t]hat there is a dangerous combination against [her]
instigated by influential persons, by reason of which [s]he cannot expect a fair trial." Tex. Code
Crim. Proc. Ann. art. 31.03(a). Alexander alleged both grounds in her motion, although the
majority of the motion focused on pre-trial publicity; she attached three affidavits in support. The
State filed a reply with controverting affidavits challenging the means of knowledge to support the
statements made in the affidavits attached to Alexander's motion. See Tex. Code Crim. Proc. Ann.
art. 31.04 (Vernon 2006) (submission of controverting affidavits attacking the credibility of the
affiants for a change of venue forms an issue to be tried by the trial judge); DeBlanc v. State, 799
S.W.2d 701, 704 (Tex. Crim. App. 1990).

 A defendant seeking a change of venue bears a heavy burden to prove the existence of "such
prejudice in the community that the likelihood of obtaining a fair and impartial trial jury is doubtful." 
Renteria, 206 S.W.3d at 709 (citing DeBlanc, 799 S.W.2d at 704). For a defendant to obtain a
change of venue based on pre-trial publicity, she must show that the publicity about the case is
"pervasive, prejudicial and inflammatory;" in other words, she must establish an "actual, identifiable
prejudice attributable to pretrial publicity on the part of the community from which members of the
jury will come." Id. (quoting DeBlanc, 799 S.W.2d at 704); Salazar v. State, 38 S.W.3d 141, 150
(Tex. Crim. App. 2001). Just because a case receives a high level of media attention does not
automatically establish such prejudice that a defendant is entitled to a change of venue. DeBlanc,
799 S.W.2d at 704 (citing Murphy v. Florida, 421 U.S. 794, 801 (1975)) (noting that jurors do not
have to be totally ignorant of the facts and issues in a particular case). The introduction of various
witnesses' testimony at the venue hearing creates a factual dispute for the trial court to resolve as to
whether the defendant can receive a fair trial in the community. Renteria, 206 S.W.3d at 709.

 At the hearing held on November 9, 2005, Alexander presented four witnesses in support of
her request for a change of venue, and admitted into evidence approximately 30 news articles
referring to the case. David Reilly, Chief Juvenile Probation Officer for Bexar County, testified that
in response to a court order he conducted an investigation and authored a report on the flaws in the
Bexar County child protective system as a whole and in particular, the CPS case related to Diamond. 
Reilly stated the CPS investigation was triggered by the recent deaths of Diamond and another child,
Jovonie Ochoa. While the report mentioned Kimberly Alexander in discussing the history of the
CPS case involving Diamond, it contained minimal information about the facts and circumstances
of Diamond's death and was wholly independent of the pending criminal investigation; Reilly
testified that the main thrust of the report was to recommend improvements in CPS procedures. 
During the 60-day investigation, there was a "steady stream of media inquiries" about the
investigation, almost daily, but they subsided after the release of the report in August 2004; the
release was accompanied by a press conference. The majority of the report's recommendations were
incorporated into legislation introduced by State Representative Carlos Uresti, and Reilly testified
at several legislative hearings on reforming the CPS system. Reilly did not know how many people
in the community had knowledge of the report.

 Representative Uresti, who was the Chairman of the House Human Services Committee,
testified that during the second half of 2004 and early 2005 he introduced legislation and conducted
hearings in Austin concerning reform of the CPS system; he stated the reform efforts were triggered
primarily by the Ochoa case. Uresti did not recall whether the names Diamond or Kimberly
Alexander were mentioned during the hearings or related press conferences and interviews, although
an enlarged photograph of Diamond was displayed at one press conference and her name was
probably mentioned then. Uresti stressed, however, that his committee's focus was on the system,
not on any one particular case, and that he never discussed the details of Diamond's case in the
media because he considered it inappropriate. Uresti confirmed that the media was very interested
in the efforts to reform the CPS system; he further opined that the Diamond Alexander case had
attracted more publicity than the average criminal case in Bexar County, but less than the Jovonie
Ochoa case which was tried in Bexar County. Uresti could not say whether Alexander could receive
a fair trial in Bexar County.

 Next, Elizabeth Fisher, an attorney who represented Alexander in the CPS case involving
Diamond and her other children, testified that the media was present at several CPS hearings held
after Diamond's death, and she anticipated heavy media interest in the upcoming jury trial involving
termination of Alexander's rights to her other children. Fisher opined that Alexander could not
receive a fair trial in Bexar County because "the jury pool is saturated with all the media coverage"
and some people in the community that she knows have made comments that presume Alexander
is guilty; however, she could not say whether any certain number of people in the community had
formed an opinion about the case. Finally, Jesse Olson, Alexander's adopted brother, testified that
he had heard some people talking about the case who assumed that Alexander was guilty, he did not
believe the media coverage of the case was fair, and did not believe she could get a fair trial in Bexar
County. The State relied on affidavits and certifications admitted into evidence showing that the
estimated population of Bexar County for 2005 was over 1.5 million people, and the Bexar County
jury pool exceeded one million individuals, with 867,981 registered voters as of October 17, 2005.

 At the conclusion of the hearing, the trial court found that no evidence was presented
showing that any of the media coverage was "anything but accurate, objective and informative." 
Finding no evidence of any inflammatory, sensational or inaccurate, and therefore prejudicial,
publicity about the case, the court denied the motion for change of venue. See Renteria, 206 S.W.3d
at 709.

 We conclude the trial court did not abuse its discretion in denying Alexander's motion for
change of venue. While Olson and Fisher testified to their opinions that Alexander could not receive
a fair trial in Bexar County based on their interaction with a limited group of citizens, Uresti and
Reilly declined to express an opinion about how many people in the community knew about
Alexander's case. Moreover, on cross-examination, the State developed evidence that the publicity
concerning the CPS reform triggered in part by Diamond's case had decreased in the months leading
up to Alexander's trial, and that the newspaper and television stories that did discuss Alexander's
case were factually accurate, and not inflammatory or prejudicial. The record adequately supports
the court's finding that Alexander failed to prove she could not receive a fair trial in Bexar County
because the pre-trial publicity devoted to her case was pervasive, prejudicial or inflammatory. (5) See
Salazar, 38 S.W.3d at 150; see also Stanley v. State, 664 S.W.2d 746, 753 (Tex. App.--San Antonio
1983, pet. ref'd). Accordingly, we overrule Alexander's second issue. 

 Admission of Specific Instances of "Misconduct"

 In her third issue, Alexander contends the trial court erred in admitting evidence of specific
instances of misconduct during the guilt/innocence phase in violation of Rule 404(b). (6) Tex. R. Evid.
404(b) (providing that evidence of other crimes, wrongs or acts is not admissible to prove character
conformity). Specifically, Alexander complains of evidence showing that: (1) she told Youngblood
that she had "access to guns and drugs;" (2) she was the subject of a CPS investigation and CPS had
removed Diamond from her care; and (3) she was a "bad mother" to Diamond. We review a trial
court's decision to admit or exclude evidence for an abuse of discretion, and will not reverse unless
the court's ruling falls outside the zone of reasonable disagreement. Torres v. State, 71 S.W.3d 758,
760 (Tex. Crim. App. 2002). The erroneous admission or exclusion of evidence is not reversible
error unless it affects a substantial right of the defendant. Tex. R. App. P. 44.2(b); Johnson v. State,
43 S.W.3d 1, 4 (Tex. Crim. App. 2001) (a substantial right is affected when the error has a
substantial and injurious effect or influence in determining the jury's verdict). 

 First, the record reflects that the trial court sustained Alexander's objection and instructed
the jury to disregard Youngblood's statement that she lied about what happened because she was
scared of Alexander since she was "always talking about how she has access to guns and drugs." 
A prompt instruction to disregard will ordinarily cure error associated with an improper question and
answer, even if it involves an extraneous offense or bad act. Ovalle v. State, 13 S.W.3d 774, 783
(Tex. Crim. App. 2000); Colburn v. State, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998) (jury is
presumed to have followed trial court's instructions). A mistrial is required only when the improper
question is "clearly prejudicial to the defendant and is of such character as to suggest the
impossibility of withdrawing the impression produced on the minds of the jurors." Ladd v. State,
3 S.W.3d 547, 567 (Tex. Crim. App. 1999) (asking of improper question seldom requires a mistrial
because instruction to disregard cures any harm in most cases). Here, Youngblood's answer was an
isolated reference to "guns and drugs" which was not repeated during trial, and therefore it was not
so prejudicial that the court's instruction to disregard could not cure the error; the court did not abuse
its discretion in denying Alexander's request for a mistrial. Id.

 Second, evidence was permitted showing that CPS removed Diamond from Alexander's care 
shortly after her birth, but the reasons for removal were not revealed to the jury. There was also
testimony that there was an open CPS case involving Diamond, and that CPS had reunified Diamond 
with Alexander two months before her death. Even if such evidence could be considered a "bad
act," or instance of "misconduct," defense counsel did not object to all of the testimony concerning
the CPS case involving Diamond; because the same evidence was admitted without objection, any
error was waived. Moore v. State, 999 S.W.2d 385, 402 (Tex. Crim. App. 1999). Moreover, the
removal and reunification evidence was a form of relationship evidence that showed the prior and
existing relationship between Diamond and Alexander; thus, it was admissible under article 38.36(a)
of the Code of Criminal Procedure. Tex. Code Crim. Proc. Ann. art. 38.36(a) (providing that
testimony showing the previous relationship in existence between the accused and the deceased is
admissible in a murder prosecution).

 Finally, there was evidence from several sources that Alexander did not interact with
Diamond in a loving, motherly way. This testimony was not evidence of an extraneous "bad act,"
but rather evidence concerning the existing relationship between Alexander and Diamond at the time
of the murder, which was admissible under article 38.36(a). Id.; Garcia v. State, 201 S.W.3d 695,
703 (Tex. Crim. App. 2006). Further, Alexander did not object to all of the evidence concerning her
relationship with Diamond, and any error was therefore waived. Tex. R. App. P. 33.1(a); Moore, 999
S.W.2d at 402. 

 Comment on Post-Arrest Silence

 Finally, in her fourth issue, Alexander asserts the prosecutor deliberately commented on her
post-arrest silence by asking Detective Titus whether Alexander "admitted any wrongdoing" during
her first interview. The trial court promptly sustained Alexander's objection and instructed the jury
to disregard the question, which was not answered by Titus. Alexander's request for a mistrial was
denied. As with the statement by Youngblood discussed supra, we find nothing in the record to
indicate that any prejudice arising from the prosecutor's question could not be cured by the prompt
instruction to disregard. Ovalle, 13 S.W.3d at 783; Colburn, 966 S.W.2d at 520; Wesbrook v. State,
29 S.W.3d 103, 115 (Tex. Crim. App. 2000) (prosecutor's single inappropriate reference to
defendant's statement, which was not admitted into evidence, was not so flagrant an error that it was
incapable of being cured by prompt instruction to disregard). Further, the court did not abuse its
discretion in denying the request for a mistrial. Ladd, 3 S.W.3d at 567. Accordingly, we overrule
this issue.

 Based on the foregoing reasons, we affirm the trial court's judgment.


 Phylis J. Speedlin, Justice

Publish



1. Alexander's brief refers to factual sufficiency of the evidence, as well as legal sufficiency, but cites no
authority and provides no argument in support of a factual sufficiency challenge; however, in the interest of
completeness, we will perform a factual sufficiency analysis of the evidence. See Tex. R. App. P. 38.1(h). 
2. Youngblood described a "fallout fit" as when someone just lays there after getting hit, thinking "get it over
with."

3. CASA is an abbreviation for Child Advocates of San Antonio, Inc. 
4. Tex. Penal Code Ann. § 9.61(a) (Vernon 2003) (justification of parent-child discipline is not available when
deadly force is used). 
5. Counsel for Alexander did not argue the "dangerous combination" ground at the hearing, and the court did
not make a specific finding on that ground when it denied the motion. Moreover, Alexander does not cite that ground
on appeal and the record contains no evidence of a "dangerous combination of influential persons" against Alexander
personally. See 42 Dix and Dawson, Texas Practice: Criminal Practice & Procedure § 25.22 (2d ed. 2001) (noting that
the "dangerous combination" must be against the defendant individually, and does not encompass a general organized
effort in the community to suppress the type of crime with which the defendant is charged); see also Hussey v. State, 590
S.W.2d 505, 506 (Tex. Crim. App. [Panel Op.] 1979).
6. Alexander includes an argument on appeal that any probative value was outweighed by the danger of unfair
prejudice; however, she did not raise a Rule 403 objection in the trial court. Tex. R. Evid. 403. Therefore, no Rule 403
issue was preserved for appellate review. Tex. R. App. P. 33.1(a).